IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GROOVE DIGITAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> KING.COM LTD., KING.COM INC., and KING.COM (US) LLC, <br><br> Defendants. | Civil Action No. 18-836-RGA |
| GROOVE DIGITAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> JAM CITY, INC., <br><br> Defendant. | Civil Action No. 18-1331-RGA |

## MEMORANDUM OPINION

Karen L. Pascale, Robert M. Vrana, YOUNG, CONAWAY, STARGATT & TAYLOR LLP, Wilmington, DE; Brian S. Seal (argued), Thomas G. Southard, TAFT STETTINIUS & HOLLISTER, LLP, New York, NY,

    Attorneys for Plaintiff.

Jack B. Blumenfeld, Cameron P. Clark, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Michael J. Sacksteder (argued), FENWICK & WEST LLP, San Francisco, CA; Geoffrey Miller, FENWICK & WEST LLP, Mountain View, CA,

    Attorneys for Defendants King.com Ltd., King.com Inc., and King.com (US) LLC.

Michael Flynn, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Stephen R. Smith (argued), Samuel Whitt (argued), COOLEY LLP, Washington, DC,

    Attorneys for Defendant Jam City, Inc.

November 14, 2022

*/s/ Richard G. Andrews*

**ANDREWS, U.S. DISTRICT JUDGE:**

Before me is the issue of claim construction of multiple terms in U.S. Patent No. 9,454,762 ("the '762 patent"). The parties submitted a Joint Claim Construction Brief (D.I. 74),[1] and I heard oral argument on September 29, 2022. I have also considered supplemental briefing on the claim term "passively deploys." (D.I. 101, 104)

## I. BACKGROUND

Groove separately filed suits against Defendants King.com Ltd., King.com Inc., and King.com (US) LLC (collectively, "King.com Defendants") (D.I. 1) and Defendant Jam City. (No. 18-1331, D.I. 1). Because the same claim terms are in dispute in both cases, the parties requested, and I held, a single Markman hearing. (D.I. 76)

The '762 patent discloses a system for delivering local content and advertisements to a user's network device via an applet application. The applet application deploys applets which contain the relevant local content and advertisements. '762 patent at 1:13-16.

The parties have stipulated to the construction of several of the terms adopted by the court and upheld on appeal in *Groove Digital, Inc. v. United Bank.* 2019 WL 1869853 (E.D. Va. Apr. 24, 2009), *aff'd*, 825 F. App'x 852 (Fed. Cir. 2020). The claim terms now in dispute were not at issue in that case.

## II. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate

---

[1] Unless otherwise noted, citations are to the 18-836 docket.

1

weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (alteration in original) (quoting *Phillips*, 415 F.3d at 1324). When construing patent claims, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977–80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted).

"[T]he words of a claim are generally given their ordinary and customary meaning. . . . [Which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13 (citations and internal quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

When a court relies solely upon the intrinsic evidence—the patent claims, the specification, and the prosecution history—the court's construction is a determination of law. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015). The court may also make factual findings based upon consideration of extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317–19 (quoting *Markman*, 52 F.3d at

980). Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. *Id.* Extrinsic evidence, however, is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

## III. CONSTRUCTION OF AGREED-UPON TERMS

I adopt the following agreed-upon constructions:

| Claim Term | Claims | Construction |
|---|---|---|
| "applet" | 1, 9-11, 36 | "a program installed by a user onto the user's device that is served based on a geotargeted specification, provides at least one browser link to a specific web page, is capable of displaying content from a party other than the party supplying the applet application, and excludes email, fax, text messages, telephone calls, mail notifications, and pop-ups" |
| "applet application" | 1, 11, 36 | "an application that runs one or more applets, and is capable of displaying the one or more queued and staged applets on the virtual desktop without requiring a network connection when the applet is deployed" |
| "internet browser" | 1, 36 | "a program that enables the user to find, locate, retrieve, and navigate any web pages on the internet" |
| "internet browser window" | 1, 36 | "a location in the applet where content from the internet is displayed by an internet browser" |
| "become idle" | 1, 36 | "disable the deployed applet when the internet browser is deployed and halt deployment of applets while the internet browser is displayed" |
| "wherein the microprocessor compares the first set of information to the second set of information to determine whether the content should be transmitted to the networked device for display by the one or more applets" | 1, 36 | "wherein the microprocessor compares the first set of information to the second set of information to determine whether the content should be transmitted to the networked device for display by the one or more applets using at least geo-target specifications" |
| "continue to operate the networked device in a state prior to the deployment of the one or more applets" | 1, 36 | Plain meaning |

3

## IV. CONSTRUCTION OF DISPUTED TERMS

The '762 patent has a priority date of March 17, 2006. Claims 1-13 and 36 are at issue. Of these, claims 1 and 36 are independent, while claims 2-13 depend on claim 1. Claims 1, 10, 11, 13, and 36 contain all the disputed terms. Claim 1 is representative of the independent claims, and reads:

1. A system for delivering information to a networked device of a user, the system comprising:
a microprocessor running a software application for delivering an applet application to the networked device and managing the delivery of the applet application to the networked device, wherein the applet application *passively deploys* one or more applets at a time of deployment,
wherein the applet application provides for delivery of content to the networked device and a display of the content in a predetermined portion of a user display that is less than an entire display of the networked device, by the one or more applets, wherein the one or more applet is configured to deploy at least one of independent of or in conjunction with an internet browser *window*, wherein an internet browser is configured to deploy subsequent to deployment of the one or more applets based on at least one action or inaction of the user, wherein at least one of the applets is configured to become idle upon deployment of the internet browser, and wherein the deployment of the one or more applets is such that at the time of deployment of the one or more applets the user can continue to operate the networked device in a state prior to the deployment of the one or more applets;
a first database *coupled* to the microprocessor and storing a first set of information relating to the user; and
a second database *coupled* to the microprocessor and including a second set of information for comparison to the first set of information
wherein the microprocessor compares the first set of information to the second set of information to determine whether the content should be transmitted to the networked device for display by the one or more applets.

('762 patent at 14:9-43 (disputed terms italicized and bolded)). The dependent claims read:

10. The system according to claim 1, wherein the display of the content by the one or more applets is via a *window* that enters a viewing area of the user display from an edge of the user display of the networked device
11. The system according to claim 1, wherein the applet application *sits in a system tray* of the networked device
13. The system of claim 1, wherein the at least one of the applets becomes idle via at least one of retreating to the *system tray* of the networked device or deactivating.

('762 patent at 15:1-6, 9-11 (disputed terms italicized and bolded)).

4

1. **"coupled" (claims 1 and 36)**

   a. *Plaintiff's proposed construction*: plain meaning ("directly or indirectly connected")

   b. *Defendants' proposed construction*: "connected such that voltage, current, or control signals pass from one to another"

   c. *Court's construction*: Connected. The connection may be direct or indirect; however, it must allow the coupled items to function cooperatively.[2]

Plaintiff argues that the plain and ordinary meaning of "coupled" is "directly or indirectly connected" under *Silicon Graphics, Inc. v. nVidia Corp.*, 58 F. Supp. 2d 331, 346 (D. Del. 1999). Indirect connections, according to Plaintiff, should include wireless connections. (D.I. 74 at 18). Plaintiff notes that Defendants' proposed construction comes from a case where components were necessarily wired because they were part of an integrated circuit, whereas the '762 patent suggests no such limitation. *Id.*

Defendants argue that, based on the specification, "coupled" in this patent necessarily refers to a wired connection. Thus, they propose the construction "connected such that voltage, current, or control signals pass from one to another." King.com Defendants argue that because the specification discusses the coupling as being "via a data bus," it must be a "direct, wired connection." They also note that, unlike in the cases cited by Plaintiff, an indirect connection is not explicitly contemplated in the specification of the '762 patent. *Id.* at 20. Jam City argues that because the coupled items "pass[] signals back and forth," *id.* at 25, and are part of "a single system," *id.* at 27, they must be directly connected. Defendants also note that Plaintiff mischaracterizes the supposed "network" connections described in the abstract. *Id.* at 21-22, 27.

---

[2] Because I adopt a construction that neither party proposed, I am open to considering additional argument about it at the summary judgment stage.

Although "the words of a claim are generally given their ordinary and customary meaning," *Phillips*, 415 F.3d at 1312, construing "coupled" here is not merely a matter of "the application of the widely accepted meaning of commonly understood words," *id.* at 1314. The parties have cited extrinsic evidence of wide-ranging definitions of the word, both broad and specific. (*See, e.g.*, D.I. 74 at 24). Perhaps most aptly, one dictionary cited in *Silicon Graphics* defines "coupled" as "a rather vague term, used to indicate that systems which might operate separately are actually being used in some form of cooperative mode," which definition remained unchanged in the edition in existence at the priority date of the '762 patent. *A Dictionary of Computing* 120 (5th ed. 2004). Therefore, the context provided by the specification must determine the construction of this term.

The specification of the '762 patent indicates that the purpose of the database is to store information about application users. '762 patent at 7:26-28. The microprocessor uses this information as an input to its computations. *Id.* at 7:40-43. Therefore, the coupling between the microprocessor and the database serves to provide the microprocessor with access to the inputs it needs. This relationship aligns well with the *Dictionary of Computing* definition of "coupled:" the database and the microprocessor are "being used in some form of cooperative mode," though a database and microprocessor in general "might operate separately."

Given this context, Plaintiff's construction is far too broad. The specification and claim language of the patent indicate that each database is in a specific partnership with the microprocessor—they are acting cooperatively. Plaintiff at oral argument, by contrast, indicated that under its definition, any pair of database and microprocessor that both had access to the internet would be coupled. (Tr. at 7:1-9).[3] That Plaintiff's proposed construction was found to be

---

[3] Citations to the transcript of the argument, which is not yet docketed, are in the format "Tr. __."

6

the plain and ordinary meaning of "coupled" in *Silicon Graphics* is irrelevant. The '762 patent resides in an entirely different field of technology and a different era[4] than the patent at issue in *Silicon Graphics*. The plain and ordinary meaning of "coupled" to a person of ordinary skill in the art (POSA) might be correspondingly different. Plaintiff correctly observes that the possible modes of indirect connection are far more numerous when indirectly connecting a database and a microprocessor than when indirectly connecting two components on a computer chip. (D.I. 74 at 18). However, I take this to indicate that the term's construction must be more, rather than less, specific for it to pin down the particular relationship contemplated by the patent.

Defendants' construction, however, is too narrow. Defendants take their construction from a case in which electric signals from a controller were coupled to a digital-analog converter. Naturally, such a coupling must entail some sort of electrical energy transfer; however, as Plaintiff correctly notes, "the terms 'voltage and 'current'—to mean an electrical current—do not appear anywhere in the '762 Patent." *Id.* Defendants are correct that the specification never explicitly contemplates indirect connection (D.I. 74 at 23); however, with only one embodiment provided, interpreting the coupling to be strictly via data bus would certainly be "importing limitations from the specification." *Phillips*, 415 F.3d at 1324. In particular, Defendants' construction imports a limitation on how information can pass from the database to the microprocessor, when, in 2006, a data bus would not have been the only way. (Tr. at 27:6-13). Indeed, it is imprecise even to say that a data bus connection entails "voltage, current, or control signals pass[ing]" from the database to the microprocessor. As the parties themselves agreed when discussing whether "portions of one database" was indefinite, a database is a "file of data." (D.I. 74 at 50, 53). A file of data is not a physical device. Voltage, current, or control signals may

---

[4] The patent at issue in *Silicon Graphics* was filed in 1996.

7

be passing from the hardware device containing the database to the microprocessor, but ultimately, only information in a more general sense is passing from the database itself to the microprocessor.

The '762 patent's specification does not take a stance on the medium through which user information is transferred. Instead, the components are "coupled" to ensure that the information may be transferred regularly and easily. I see no reason that the information should not take an indirect path, so long as the microprocessor can access its particular partner databases dependably, whenever and with whatever frequency it needs. My construction reflects this.

2. **"passively deploys" (claims 1 and 36)**

   a. *Plaintiff's proposed construction*: plain meaning ("delivered non-invasively and without interrupting the user's activities")

   b. *Defendants' proposed construction*: "providing a signal to which the user may respond, thereby causing deployment"

   c. *Court's construction*: "providing a signal to which the user may respond, thereby causing deployment"

Plaintiff argues that "passively deploys" needs no construction. When prompted for its plain and ordinary meaning, Plaintiff offered, "delivered non-invasively and without interrupting the user's activities." (D.I. 98). At oral argument, Plaintiff suggested that "passively deploys" was a term of art. I ordered supplemental briefing on the issue. In its supplemental briefing, Plaintiff argues that the phrases "passive applications" and "passive content delivery" were used in a patent with a priority date of July 24, 2000, and that these usages mirrored the patent's usage of "passively deploys." (D.I. 101).

Defendants argue that "passively deploys" has no plain meaning and is defined by the patentee in the specification. (D.I. 74 at 37). In its response to Plaintiff's supplemental briefing,

8

Defendant Jam City argues that Plaintiff provides no actual evidence that the specific phrase "passively deploys" was a term of art. (D.I. 104).

I agree with Defendants that Plaintiff has failed to show that "passively deploys" has any plain and ordinary meaning or that it is a term of art. In the absence of such a showing, I look to the specification to construe the phrase. The specification reads,

> [T]he offer may be passively or invasively delivered directly into the system tray of the user via the applet. The offer may be delivered passively by setting some sort of signal to which the user may respond, thereby causing a delivery of the offer. Alternatively, the offer may be delivered invasively into a visible location on the virtual desktop or audibly.

'762 patent at 3:35-41. While the guidance provided by the specification may not constitute explicit lexicography, it clearly presents "passively" as dichotomous to "invasively." The parties agreed that this was the case at oral argument. (Tr. at 38:20-39:4).

The description of passive delivery indicates that the offer itself is not available to the user until the user responds to the signal. Invasive delivery, by contrast, delivers the offer itself "into a visible location ... or audibly." '762 patent at 3:40-41. Thus, the key difference between passive and invasive delivery as described in the specification is whether the offer itself is visible, or whether the user is simply made aware that an offer is available. Therefore, I infer that offer visibility is a distinguishing characteristic of "invasive" delivery. Although Plaintiff's construction aptly invokes the word "non-invasively," it provides no further detail on the meaning of "invasively." Meanwhile, Defendants' proposed construction reflects the distinction drawn in the patent, and I therefore adopt it.

### 3. "portions of one database" (claim 2)

   a. *Plaintiff's proposed construction*: plain meaning ("contained within a single database")

   b. *Defendants' proposed construction*: indefinite

9

    c.    *Court's construction*: plain meaning

I ruled that the claim term "portions of one database" was not indefinite at the claim construction hearing. (Tr. at 62:16-17).

**4.    "window" (claim 10)**

    d.    *Plaintiff's proposed construction*: plain meaning ("work area on the screen used by an application")

    e.    *Defendants' proposed construction*: "a defined portion of the display screen within which information is displayed that is separated by a frame from the rest of the screen and which may be opened, closed, resized, moved, overlaid, minimized, and maximized"

    f.    *Court's construction*: "an area on a computer screen with defined boundaries, and within which information is displayed. Windows can be resized, maximized, minimized, placed side-by-side, overlaid, and so on."

The parties disagree on how my construction of the term "window" will relate to the stipulated construction of "internet browser window." That construction, from *United Bank*, is "a location in the applet where content from the internet is displayed by an internet browser." (D.I. 74 at 57). The phrase "internet browser window" appears in claims 1 and 36, while the isolated word "window" appears only in claim 10. Plaintiff argues that its proposed construction, unlike Defendants', is consistent with the construction of "internet browser window." (Tr. at 63:3-10). King.com Defendants do not address the issue directly but suggest that no inconsistency issue exists. (*See* D.I. 74 at 59 n. 12). Defendant Jam City asks me to construe this term only as it appears in claim 10, as "window" in claim 10 "is used differently" than window in the context of "internet browser window." (*Id.* at 60 n. 13). Indeed, claims 1 and 36 describe an "internet browser window" separate from the applet, '762 patent at 14:22-25, 17:20-22, whereas claim 10 describes the applet itself using a "window," '762 patent at 15:1-4. Therefore, I construe "window" as it appears in claim 10 without changing the stipulated construction of the phrase "internet browser window" in claims 1 and 36.

10

Plaintiff argues that "window" needs no construction and should be given its plain and ordinary meaning. On prompting, Plaintiff offered that the plain and ordinary meaning of window to a POSA in 2006 was "work area on the screen used by an application." (D.I. 98). During oral argument, Plaintiff indicated the source of this plain meaning was the *IEEE 100 Authoritative Dictionary*. (Tr. at 62:25-63:2). Plaintiff objects to Defendants' constructions as "specific to desktop-based computer systems," while the '762 patent is not limited to desktop embodiments. (D.I. 74 at 63).

The King.com Defendants argue that their proposed construction is consistent with the specification's description of a window. In particular, they note the varieties of prior art, pop-up windows listed in the specification. '762 patent at 1:45-62. Meanwhile, Defendant Jam City argues that its construction is drawn from extrinsic evidence of what "window" meant to POSAs. Jam City cites to an array of dictionaries. It acknowledges that its definitions are drawn from desktop computer user interfaces but argues that "window" would have connoted a desktop environment to a POSA in the relevant time period. (D.I. 74 at 61).

The key differences between Plaintiff and Defendants' constructions are the boundaries and the capabilities of a window. As to the boundaries, the claim language itself is instructive. The claim recites that the window "enters a viewing area." '762 patent at 15:3. Thus, it seems important that the window have defined boundaries, or it could not be seen to be entering the screen. The specification and claim language are less illuminating as to the capabilities of a window, but it is clear from briefing and oral argument that "window" had some sort of plain and ordinary meaning to a POSA, and I therefore look to extrinsic evidence for that meaning.

Both parties have offered a variety of proposals for what "window" would have meant to a POSA. In fact, the *IEEE 100 Authoritative Dictionary* includes eight separate definitions for

11

"window," spanning several technical fields, and both Plaintiff and Defendants' proposed constructions are *IEEE* definitions. (JA00055, *IEEE Authoritative Dictionary* 1281 (7th ed. 2000)). Consequently, *IEEE*'s definitions primarily serve to demonstrate the importance of construing this term in light of the patent's specification. Both parties agreed at oral argument that the *Wiley Electrical and Electronics Engineering Dictionary* was an appropriate source for the time period in question. (Tr. at 68:8-12, 74:1-4). *Wiley* reads:

> An area on a computer screen with defined boundaries, and within which information is displayed. Windows can be resized, maximized, minimized, placed side-by-side, overlaid, and so on. Each window can be that of a separate program, while a single program may have any number of windows open at a given moment. When two or more windows are open, only one is active, and the rest are inactive.

(JA00028, *Wiley Electrical and Electronics Engineering Dictionary* 863 (2004)). This definition aligns well with the limited details provided in the patent itself. Therefore, I adopt the first two sentences of *Wiley's* definition as the construction of "window."

Regarding Plaintiff's argument that "window" must be broadly construed to allow non-desktop computer embodiments, I see no need to broaden an evidence-supported construction of the term "window" so that claim 10—a dependent claim—will apply to all non-desktop embodiments. Jam City is correct in observing that while the patent contemplates non-desktop embodiments, it does not disclose "embodiments in which desktop-specific terms like 'window' . . . are associated with mobile devices or anything other than a desktop computer." (D.I. 74 at 61, n.14). All extrinsic evidence seems to suggest that "window" as used in the patent is a desktop-specific term.

    **5.    "system tray" (claims 11 and 13)**

        a.    *Plaintiff's proposed construction*: plain meaning ("an area that displays program icons")

        b.    *Defendant Jam City's proposed construction*: "an area situated at the righthand end of the taskbar that displays small icons of frequently used system utilities and

12

    applications that are automatically loaded when the operating system starts and run in the background"

 c. *King.com Defendants' proposed construction*: "an area of the taskbar that displays small icons of frequently used software programs and system software programs that were run automatically when the operating system started and are now running in the background"

 d. *Court's construction*: "an area, such as that located on taskbar, which serves to display small icons of certain programs, such as a time/day, volume control, status of a modem, and the like."

Plaintiff argues that "system tray" needs no construction and should be given its plain and ordinary meaning, which Plaintiff contends is, "an area that display program icons." (D.I. 74 at 67, D.I. 90). Plaintiff argues that Defendants' constructions are too narrow and import limitations from the specification. At oral argument, Plaintiff also maintained that because the patent explicitly contemplates non-desktop embodiments, the term "system tray" should be construed to accommodate such embodiments. (Tr. at 90:3-5).

Defendants argue that based on the specification, "system tray" should be given a narrower interpretation, and that such an interpretation also aligns with contemporaneous usage of the term. (D.I. 74 at 68, 70). Defendants cite to several technical dictionaries to support their constructions. King.com Defendants do concede that "in 2005 taskbars could be displayed in various screen locations." (D.I. 74 at 73). Thus, their proposed construction differs from Jam City's. Jam City argues that usage of the term in the relevant time period was "exclusively associated with an area situated at the righthand end of the taskbar in desktop computers running Microsoft Windows." (*Id.* at 75). Therefore, according to Jam City, construction of the claim term must be limited to such embodiments. Jam City relies particularly on the *Penguin Concise Dictionary of Computing* for its assertions, though other dictionaries provide some support as well. (*Id.* at 70).

13

Plaintiff's construction would render the term so broad that any arbitrary section of the screen containing icons could be considered a system tray. For example, it seems to me that under Plaintiff's construction, a virtual desktop itself could be a "system tray," as could any file explorer displaying the contents of a folder. Icons are staples of user interface design and appear ubiquitously on computer screens. As with "window," Plaintiff's argument that the term must be construed broadly because the patent explicitly contemplates non-desktop embodiments is not convincing. I see no need to construe this term, which only appears in dependent claims, so broadly as to be applicable to any arbitrary user interface that is, was, or will be.

That said, Plaintiff is correct to argue that "system tray" need not exclusively refer to a feature of the Windows operating system. This is the case even though, based on the sources cited by the parties, I tend to agree with Defendants that "system tray" traditionally refers to a Windows feature. While the specification of the patent shows a Windows system tray, '762 patent, fig. 1, *Penguin Concise Dictionary of Computing* alludes to—and I want to allow the possibility of—equivalent functionalities in other operating systems, like the Mac OS and Linux operating systems. (*See* JA00143-JA00144, *Penguin Concise Dictionary of Computing* at 435, 438 (2003) (noting that a system tray is an area of the taskbar, and then that the taskbar has "equivalents in several other operating systems")). Therefore, Jam City's definition is certainly too narrow. The King.com Defendants' construction is less restrictive, but it still requires a "taskbar," a feature of the Windows operating system, according to the *Penguin Concise Dictionary of Computing. Id.*

As noted above for "window," both sides have cited to Wiley for the construction of "system tray." (D.I. 74 at 69; Tr. at 80:11). Wiley's definition of "system tray" reads,

> An area, such as that located on the lower right-hand side of the taskbar, which serves to display small icons of certain programs, such as a time/day clock, volume

14

> control, status of a modem, and the like. The functions of such applications can be easily accessed by double-clicking or right-clicking the corresponding icon.

(JA00027, *Wiley Electrical and Electronics Engineering Dictionary* at 767 (2004)). I again take Wiley to be a good indication of the plain meaning of the term to a POSA. The Wiley definition strikes a balance between reducing "system tray" to the Windows system tray and broadening it to include all icon-based interfaces. I adopt its first sentence as the Court's construction with a single modification: I remove the restriction that the system tray be on the "lower right-hand side" of the taskbar, since, as discussed above, taskbars could be displayed at various locations in 2005. Should this construction leave any residual ambiguity as to what is or is not a system tray, I am open to reconsidering the construction at the time of summary judgment.

6. **"sits in a system tray" (claim 11)**

   a. *Plaintiff's proposed construction*: plain meaning ("located in the system tray")

   b. *Defendant Jam City's proposed construction*: "has an associated icon displayed in a system tray"

   c. *King.com Defendants' proposed construction*: "has an associated small icon displayed in the system tray"

      a. *Court's construction*: "is located in a system tray"

Plaintiff argues that this term needs no construction and simply means "located in the system tray." (D.I. 74 at 77). Defendants argue that given the specification's depiction of system tray as being an area of the taskbar with small icons, theirs is the natural definition. *Id.* at 79.

Given my construction of system tray, it would seem that the two constructions are equivalent. If a system tray "serves to display small icons of certain programs," then anything located in the system tray should be represented by a small icon. Therefore, for concision, I adopt the construction "is located in a system tray."

15

## V. CONCLUSION

Within five days the parties shall submit a proposed order consistent with this Memorandum Opinion.