IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

GROOVE DIGITAL, INC., )
)
Plaintiff, )
) C.A. No. 18-836-RGA
v. )
)
KING.COM, LTD., et al., )
)
Defendants. )

J. Caleb Boggs Courthouse
844 North King Street
Wilmington, Delaware

Friday, November 17, 2023
10:57 a.m.
Oral Argument

BEFORE: THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

APPEARANCES:

YOUNG CONAWAY STARGATT & TAYLOR, LLP
BY: KAREN L. PASCALE, ESQUIRE

-and-

TAFT STETTINIUS & HOLLISTER LLP
BY: BRIAN SEAL, ESQUIRE

For the Plaintiff

APPEARANCES CONTINUED:

MORRIS NICHOLS ARSHT & TUNNELL, LLP
BY: JACK B. BLUMENFELD, ESQUIRE
BY: CAMERON P. CLARK, ESQUIRE

-and-

FENWICK & WEST LLP
BY: MICHAEL J. SACKSTEDER, ESQUIRE
BY: GEOFF MILLER, ESQUIRE
BY: GREGORY SEFIAN, ESQUIRE
BY: SHREYAS A. KALE, ESQUIRE

For the Defendants

10:57:23 *** PROCEEDINGS ***

10:57:23 DEPUTY CLERK: All rise. Court is now in
10:57:32 session. The Honorable Richard G. Andrews presiding.
10:57:32 THE COURT: All right. Good morning. Everyone,
10:57:35 please be seated.
10:57:36 Ms. Pascale, you represent the Plaintiff here?
10:57:42 MS. PASCALE: Yes. Good morning, Your Honor.
10:57:45 Karen Pascale from Young Conaway Stargatt & Taylor for the
10:57:48 Plaintiff, Groove Digital. And I'm here today with Brian
10:57:51 Seal from Taft Stettinius & Hollister.
10:57:53 THE COURT: All right. Well, good morning to
10:57:56 you both.
10:57:57 And Mr. Blumenfeld.
10:57:59 MR. BLUMENFELD: Good morning, Your Honor. Jack
10:58:02 Blumenfeld from Morris Nichols for the King Defendants. And
10:58:07 with me at counsel table are Michael Sacksteder and Geoff
10:58:11 Miller from Fenwick & West. Behind them, Greg Sefian, also

from Fenwick & West.

Ben Lin who's from Activision, which is King.com's parent or affiliate. I'm not sure exactly the relationship.

Cameron Clark from Morris Nichols. And Shreyas Kale also from Fenwick & West.

THE COURT: All right. Thank you.

So I think the way I imagined this was that the Defendant would go first on at least the first couple of things here.

MR. SACKSTEDER: Good morning, Your Honor. Your Order identified, I think, three issues: Anticipation and non-infringement, and there are two non-infringement arguments.

Do you have any preference in which way we go?

THE COURT: No, whatever way makes sense to you.

MR. SACKSTEDER: Okay. I have slides. I don't know how much I'm going to be using them, but I know you'd probably prefer I don't use them very much.

So I'll start with --

THE COURT: It seems to be pretty thin.

MR. SACKSTEDER: Well, we tried to be streamlined.

THE COURT: Well, that's good.

MR. SACKSTEDER: So I'll start with the 102(b)

issue --

THE COURT: Okay.

MR. SACKSTEDER: -- which relates to the product UpNow, which was developed -- made available for access on the Internet.

THE COURT: Well, so let me just interrupt you to ask Mr. Seal a question, because I think the only argument that the Plaintiff is making as to why I shouldn't grant summary judgment here has to do with this become idle limitation. Everything else is not disputed; right?

MR. SEAL: That's right, Your Honor.

THE COURT: Okay.

MR. SACKSTEDER: Okay. So I'll skip over some of it.

There is no dispute, apparently, that the UpNow product was publicly available in public use more than a year before the filing date, the effective filing date of the '762 patent. And so --

THE COURT: And I'm sorry. Let me just interrupt you for a second time. The way it was briefed, my impression is that basically if I consider Claim 1, and Claim 1 is anticipated, there's no -- or it's not anticipated, whichever the case may be, it's not disputed that that flows through to all the other asserted claims -- or flows through is not the technical term, but they rise

and fall together; is that right?

MR. SACKSTEDER: I don't understand there to be any dispute.

THE COURT: Well, I didn't -- but I like to check. Mr. Seal, is that right?

MR. SEAL: That's correct, Your Honor.

THE COURT: Okay. All right.

MR. SACKSTEDER: Okay. So the only issue here is whether the UpNow product, as it was made available in February of 2005, actually practiced the claims of the patent. There are two points that I think, you know, sort of preempt that argument initially.

First is that in the interrogatory responses, the Plaintiff admitted several times that UpNow practiced the claims of the patent.

Here we go.

THE COURT: Well, and let's sort of speed through all this stuff because I do understand --

MR. SACKSTEDER: Sure.

THE COURT: -- this part of your argument. The part of your argument that I need help on is the expert, Dr. -- I'm going to call him B because I don't remember his full name.

MR. SACKSTEDER: Bederson.

THE COURT: Dr. Bederson. You know, his

analysis, which as I understand the Plaintiff's position, is essentially his analysis is that it doesn't anticipate, that it doesn't have this limitation. And so you can tell me why that's irrelevant, one way or the other, which is what I think you're doing now, but that's the thing that's most on my mind.

MR. SACKSTEDER: Understood. And I'll address that first and then I'll come back to the why it's irrelevant part.

THE COURT: Okay.

MR. SACKSTEDER: So Dr. Bederson conducted his analysis and performed it based on various testimony that one of the inventors, Mr. Gaidemak, had provided. In that testimony, Mr. Gaidemak referred to two different things as a microbrowser.

And the question is: The thing that has to become idle is the Internet browser or the applet has to become idle while the Internet browser is active. Mr. Gaidemak, in some of his testimony, talked about both the Internet browser and a component of the applet, both of them as a microbrowser, even though he was treating them as two different things.

Dr. Bederson in his report referred to those as separate things, but, again, was quoting Mr. Gaidemak, used the same terminology. So he was saying that the thing that

is the Internet browser, when it is deployed, the applet is made idle. And that's --

THE COURT: Sorry. The applet is what?

MR. SACKSTEDER: Is made idle.

THE COURT: Made idle. Okay.

MR. SACKSTEDER: That's the thing -- you have to have the applet not be active anymore when the Internet browser is deployed. And that's what he was saying. He was just using Mr. Gaidemak's words, and Mr. Gaidemak was perhaps a little bit confused about his terminology and was using microbrowser to mean sometimes a component of the applet, sometimes the actual Internet browser.

THE COURT: So I thought I saw in some briefing somewhere your attempt to make this clear. Is there something more you have to say on that than what you just said?

MR. SACKSTEDER: I think that's how we explained it. And I think that's -- if you look at Dr. Bederson's report, I think that's where you will -- yeah, you'll see it.

And the other thing is that Dr. D'Andrade, Plaintiff's expert, never said anything about it. You know, so he did not dispute the conclusion or the supporting evidence that was relied on by Dr. Bederson that the remain or becomes idle limitation is practiced.

11:05:07 THE COURT: Well, and I do understand that, and I think the briefing doesn't cite Dr. D'Andrade. The way I understand Plaintiff's argument is essentially, I don't know, there's internal contradictions in what Dr. Bederson says; and therefore, it can't be used to grant summary judgment.

11:05:30 I was wondering -- this may be in the briefing, but I don't recall, one way or the other -- was Dr. Bederson, who I assume was deposed at some point, asked about this at the deposition by anybody?

11:05:44 MR. SACKSTEDER: I don't believe so, Your Honor. I wasn't present at that deposition, so I'm not positive of that answer. Mr. Seal maybe could address it when he comes up.

11:05:57 THE COURT: Okay. All right. If you've said everything there is to say about that, and you want to go on to the other part of it, that's fine.

11:06:14 MR. SACKSTEDER: I think I have.

11:06:15 THE COURT: Okay.

11:06:16 MR. SACKSTEDER: And we don't think it matters any way. You know, we have admissions in interrogatories. We have Mr. Gaidemak specifically testifying that UpNow practiced the claims of the patent-in-suit.

11:06:29 In the interrogatories, it comes up several times. It's unequivocal.

11:06:34 And if you look at the *Leader* case from this Court, which is the case that we rely on, it's actually a lot more ambiguous there, and the Court credited the interrogatory responses and testimony there. It was in a different procedural posture because it was a question of substantial evidence in a motion for new trial, but in that case, it wasn't entirely clear from the interrogatory responses when the product practiced the claims of the patent. It wasn't entirely clear from the testimony, both in deposition and at trial, whether the -- you know, sort of when the claims of the patent were practiced by the allegedly on sale in public use product.

11:07:17 Whereas here, we have unequivocal statements. The only authorized product going back there embodying the claims of the patent-in-suit was a software product named UpNow. That was only available back in 2005, UpNow, which product embodied the claims of the patent.

11:07:35 There's a case that is relied on called the *Stroud* case from Oklahoma in Plaintiff's briefing where they say, Well, it wasn't verified. So, you know, our fingers were crossed. It doesn't count.

11:07:49 But in that case, it wasn't verified. It wasn't signed by counsel either in that case. And here we have it -- there is no dispute that it was signed by counsel. And Mr. Miller and I keep going back and forth. And so it's

a representation of the party, and they're saying that UpNow practiced the claims of the patent-in-suit.

Mr. Gaidemak then in his deposition said the same thing. And specifically this is right here, I was actually walking through. He was their 30(b)(6) designee on this topic. And I was walking him through the topics when he gave this testimony. And I was saying -- he said, Well, he was the person most knowledgeable about the covered products in terms of UpNow and that their patent attorney probably knew more about covered products that were allegedly infringing products.

And I said, "Okay. And you believe that UpNow was a covered product in that it practiced the claims of the patent; correct?"

"Answer: Yes."

This is where he's talking about being the 30(b)(6) designee on behalf of the company. UpNow practiced the claims of the patent.

So he testified that, again, unequivocally. He also, when he was developing all this in 2005, he created documents that described what UpNow did and what was to be in the patent. He gave those documents to two people.

He gave them to D&D Interactive who actually developed UpNow, you know, wrote the code for it. And he gave them to the patent attorney to write the patent. And

11:09:27 he said, "Here's the thing that I invented. Go do your stuff."

11:09:32 And so in both of those cases, you know, he had clearly provided the same information to both. He has said under oath that UpNow practiced the claims of the patent.

11:09:44 So we think the analysis regarding the becomes idle limitation is really not necessary, although we think it favors summary judgment as well.

11:09:56 THE COURT: Okay. If that's all you have, then I will hear Mr. Seal in response.

11:10:02 MR. SACKSTEDER: Okay.

11:10:08 MR. SEAL: Thank you, Your Honor. The important point here is that Dr. Bederson did not rely on any of the deposition testimony from this case that King is now trying to present. If they want to present that testimony at trial to counter our arguments, we're fine with that. We're not asking you to strike any of that material. We're saying that they cannot survive summary judgment because Dr. Bederson's analysis is flawed. And it's flawed because he specifically differentiates between the microbrowser, which is contained within the applet, and what he calls a standard Internet browser, which is what deploys after the applet is clicked or touched.

11:10:45 And according to Dr. Bederson's theory, the applets have to halt deployment upon the launching of the

standard Internet browser. That's his theory. That's King's theory. That's what's in their report. That's what they rely on.

But in Dr. Bederson's report, all of the evidence that he cites for that, all of it refers to the launching of another microbrowser, which, again, he says a different thing. He said a person of ordinary skill in the art would understand that a microbrowser is not the same thing as a standard Internet browser.

So we cited this section in his report. That's his only evidence in support of this limitation for invalidity. And he cited Mr. Gaidemak's testimony from the IPR proceeding, his declaration. I think maybe his deposition from the IPR.

THE COURT: You said his declaration?

MR. SEAL: Mr. Gaidemak submitted a declaration in connection with the IPR proceedings.

THE COURT: You're saying "declaration"?

MR. SEAL: Declaration.

THE COURT: Okay.

MR. SEAL: That's what Mr. Bederson relied on. And that -- as you can see from our briefing, every bit of evidence that's contained within that paragraph of Dr. Bederson's report refers to the halting, the disabling of applets upon the launching of a microbrowser. He never

anywhere points to the halting of applets upon the launching of a standard Internet browser, which is what he says himself has to happen.

THE COURT: Well, so what do you make of the various interrogatory answers, Rule 30(b)(6) testimony, IPR declarations, which all seem to say, by somebody who should know or by somebody who's a representative of the corporation, or representative of the Plaintiff, 30(b)(6) witness of the Plaintiff, that it does practice the patent?

MR. SEAL: The deposition testimony in this case by Mr. Gaidemak is consistent with our discovery responses which is consistent with his declaration and deposition in the IPR, which is that in Groove Digital's view, the 30(b)(6) representative, the disabling of applets happens upon the deployment of a microbrowser. That's what Mr. Gaidemak testified to. That's his understanding as 30(b)(6) witness.

Dr. Bederson is the one that said that that's not how he is analyzing the claims for invalidity. Dr. Bederson's the one that says it has to be disabled upon the launching of a standard Internet browser. So the statements by Mr. Gaidemak, both at deposition here and in the IPR, are certainly things that can create a fact question at trial, and a jury's entitled to hear those things. Again, we're not asking you to strike any of that

material like happened in the *Stroud* case.

But that does not support Mr. Bederson's analysis. The only analysis that they've represented --

THE COURT: So if the only evidence here were Mr. Gaidemak's various statements in the various places where he's made them, including on behalf of the corporation, why wouldn't that be -- forget Dr. Bederson -- why wouldn't that be essentially a concession on your part that it is anticipated?

MR. SEAL: Because they're not admissions, Your Honor. If they had asked us in Request for Admissions whether the UpNow product practiced the claims of the patent, we'd have a different argument here today.

THE COURT: But certainly the statement of a Rule 30(b)(6) witness is maybe not an admission of a Request for Admission, but it literally comes under the evidentiary rule which is admission of a party opponent; right?

MR. SEAL: Right. But the context of those statements, if you want to call them admissions, make clear that they do not comport with Dr. Bederson's invalidity theory, on their own.

THE COURT: Right, right. But I guess what I'm saying is, Okay, Dr. Bederson has an invalidity theory. All right. Why isn't it enough, from the Defendants' point of view or from a question before me, that even if Dr. Bederson

is wrong, the testimony of Mr. Gaidemak, the interrogatory answers, that's a basis to find anticipation?

MR. SEAL: It could be at trial certainly, Your Honor, but it can't be at summary judgment.

THE COURT: Why?

MR. SEAL: Because King still bears the burden of proving by clear and convincing evidence that each limitation is met. And the context of those statements show that they're not met under King's invalidity theory, and the only invalidity theory that King has offered in this case.

THE COURT: But why can't I just adopt Mr. Gaidemak's invalidity theory?

MR. SEAL: Because it's inconsistent with the invalidity theory. First of all, it's not an invalidity theory that King has presented. So we have not had a chance to respond to that as an invalidity theory.

THE COURT: Well, I don't know. My impression, from the way the briefing was presented, is, you know, their view, I think, is there's no difference between Mr. Gaidemak, other than possibly terminology and what Mr. Bede --

MR. SEAL: Bederson.

THE COURT: Dr. B said. I'm not sure that you saying that's two different theories and Dr. B's theory is no good does anything other than, at the most, knock out one

of the two theories that are in the record here.

MR. SEAL: No. Our position is there's only one theory in the record, which is Dr. Bederson's theory. That these other statements are certainly evidence that can be considered by a jury, but they alone do not meet the clear and convincing standard for meeting invalidity because there's a dispute as to how they apply to the claim construction in this case, as understood by King's expert, and the invalidity theory as proffered by King's expert.

THE COURT: But is there something in the record where Mr. Gaidemak says I don't understand what the claim construction is or, I mean, I guess saying -- because I think you probably did this deposition fairly late in the case. Weren't all those issues resolved by then? Wasn't claim construction resolved by then?

MR. SEAL: Claim construction, I think it issued by the time Mr. Gaidemak gave his deposition. I'm not a hundred percent sure about that. I think that is the case.

But the other context for Mr. Gaidemak's statements is that Groove Digital's opinion or contention has been that it's entitled to an earlier priority date because UpNow, the intent was always to capture the UpNow product in what became the '762 patent. And that included the provisional application that was filed in 2015.

THE COURT: But that's not an issue before me

now; right?

MR. SEAL: Right. And the reason we didn't argue that before you today, Your Honor, was because we were focused on the invalidity theory that was presented by Dr. Bederson. So if you want to get into whether or not the statements make sense in light of our priority contention, that's a different question. It hasn't been briefed, and we're happy to do that.

But our posture here for summary judgment was to point out that Dr. Bederson's infringement or invalidity theory was flawed. And pointing to generalized discovery responses and deposition testimony that contradict Dr. Bederson's position, I don't think rise to the level of clear and convincing evidence for invalidity purposes.

THE COURT: Okay. And so, do you -- and maybe you've said all you have to say on this topic, but in terms of Dr. Bederson and his discussion of microbrowser and standard Internet browser -- actually, I'll come back to that thought.

Basically in terms of what Dr. Bederson's opinions are, the only thing I have is his expert report; right? This particular topic is not addressed in deposition, not addressed by your expert, is just a question essentially of interpreting perhaps what Dr. Bederson said in his report?

MR. SEAL: Our argument is entirely contained within his report. That's correct. We don't think there's a question of interpretation. We think it's very clear that he says one -- but, yes, that's correct.

THE COURT: Again, so I was trying to leave that out. In terms of -- but the job for me, according to you, is to look at this expert report, see if it's, in your view, not clear enough to be something I can rely on and perhaps, in the Defendants' view, sort of the same thing, but it is clear enough. But in terms of interpreting what's in the expert report, essentially I'm kind of left to my own devices supplemented by whatever argument both sides have made; right?

MR. SEAL: That's correct, Your Honor. And to be more precise about it, our understanding of what your task is for this argument is to look -- I think it's Paragraph 496 of Dr. Bederson's report and determine whether he adequately supported his opinion that the applets in the UpNow product halted upon deployment of a standard Internet browser. Our position is they didn't, but that's the job.

THE COURT: Okay. I appreciate that. I appreciate what you're saying there.

So is there anything more you want to say about this?

MR. SEAL: That's all I have on that one, Your

11:21:25 Honor.

11:21:25 THE COURT: Okay. Thank you, Mr. Seal.

11:21:27 MR. SEAL: Thank you.

11:21:33 MR. SACKSTEDER: Your Honor, if I could address
11:21:35 a couple of points --

11:21:36 THE COURT: Yeah.

11:21:37 MR. SACKSTEDER: -- Mr. Seal made.

11:21:38 THE COURT: Please do.

11:21:39 MR. SACKSTEDER: First, I think I heard him say
11:21:41 that the inclusion, what's included in the provisional
11:21:46 application and its relevance, the priority date wasn't
11:21:49 briefed.

11:21:49 It certainly was. It was in our opening brief.
11:21:52 It wasn't responded to. So it was addressed.

11:21:56 THE COURT: And --

11:21:58 MR. SACKSTEDER: Page 27 of our opening brief.

11:22:00 THE COURT: Let me just -- you say it's on
11:22:04 Page 7?

11:22:05 MR. SACKSTEDER: Twenty-seven.

11:22:05 THE COURT: Oh, 27. Sorry.

11:22:12 Okay. Yes. Well, I see a heading "Provisional
11:22:19 Application Fails To Provide An Earlier Priority Date." And
11:22:20 I think what Mr. Seal said or what he would say is, for
11:22:26 purposes of Dr. Bederson, the reason it's not briefed is
11:22:29 because they don't care; right?

MR. SACKSTEDER: I guess that's what he's saying. I can't speak for him.

THE COURT: No, no, but I just --

MR. SACKSTEDER: I just wanted to make sure it was clear. We raised that. They didn't oppose it.

THE COURT: Okay. Well, in any event, that is helpful.

Yes. Go ahead.

MR. SACKSTEDER: All right. Second, concerning the impact of the Rule 30(b)(6) testimony, we have a case quotation from the Federal Circuit in our briefing. "Rule 30(b)(6) testimony binds a corporation in that it is deemed to be the testimony of the corporation itself." And --

THE COURT: And so that I wouldn't disagree in the sense of it's the testimony. It doesn't mean it's a stipulated fact.

MR. SACKSTEDER: It's an uncontroverted admission, Your Honor. It doesn't have to be a request for admission. It's an admission by the company in the deposition.

THE COURT: Well, I do -- so that's interesting because it's come up for me before, and what I've said before -- and this may have been in a trial, so maybe no actual record of it that anyone can find. Though I'm sure

11:23:49 if there is, Mr. Blumenfeld can find it -- is that in a trial setting, yes, the statement of a 30(b)(6) is a statement of a corporation. But if somebody comes in and says something different, the jury can consider that, too.

11:24:16 MR. SACKSTEDER: They don't have any evidence about something different, though.

11:24:19 THE COURT: Well, I --

11:24:20 MR. SACKSTEDER: -- that was Dr. D'Andrade saying anything.

11:24:23 THE COURT: Well, my next thought is you said it's -- for lack of the fact that you said it's uncontradicted. And certainly, based on what I've been told just here today, nobody from the Plaintiff has ever put forth something different. You know, if their expert had in his report, blah, blah, blah, you know, that would be something, but he doesn't.

11:25:00 MR. SACKSTEDER: That's correct. The only thing that we have ever seen about this is attorney argument in the opposition to our motion for summary judgment and in their motion for summary judgment.

11:25:11 THE COURT: Well, and to some extent, and I'm not using this in the usual prejudicial fashion, I've also got attorney argument on your side; right? I mean, both of you are arguing as to what this, particularly being Paragraph 496, means; right?

11:25:34 MR. SACKSTEDER: We have uncontradicted expert testimony, expert opinion from Dr. Bederson's expert report where he says this limitation is satisfied.

11:25:47 THE COURT: Well, right.

11:25:48 MR. SACKSTEDER: And he uses the language that --

11:25:49 THE COURT: Well, Mr. Seal -- you know, so there's the high level. It's satisfied. But for purposes of summary judgment, to the extent that I'm just relying on your expert, then you want to see some analysis to back it up.

11:26:03 And I think, you know, you're telling me what it -- I think referring to this same Paragraph 496, you're telling me, Here's what it means. He was, you know, dealing with Mr. Gaidemak's, you know, use of microbrowser, standard Internet browser, different language. But that if you, you know, parse through it, you understand it to mean what you say it means. And it's not like I have testimony under oath from Dr. Bederson saying, Here's the logic of this; right?

11:26:59 MR. SACKSTEDER: Well, he attempted to explain his logic in his opening report. And he was not rebutted in Dr. D'Andrade's rebuttal report, so there was no need to further explain it in his reply report. The only place this has ever come up is in these motions. So I think still the unrebutted evidence is Dr. Bederson's evidence.

And if I can address a couple of points about what's in the claims and what isn't, the term microbrowser does not appear in the claims.

THE COURT: Right.

MR. SACKSTEDER: The microbrowser comes up because, as you may or may not recall, we had a long discussion about the passively deployed claim limitation about this time last year. I'm shocked you don't remember it, but we did. And there are sort of three steps there where the user receives a signal, and then within the applet, a microbrowser shows up. A thing shows up that allows you then to go to an Internet browser.

And in Mr. Gaidemak's testimony, he used microbrowser interchangeably from time to time, and in the part that was relied on by Dr. Bederson to refer to the Internet browser as the term microbrowser. And so Dr. Bederson also used the same terminology, used the quotations from Mr. Gaidemak's testimony in various places, as Mr. Seal mentioned, to explain that. But he explained it. There's no rebuttal. He didn't have to further explain it in his reply.

THE COURT: And do you agree with Mr. Seal, Paragraph 496 of the opening expert report, that's kind of the key paragraph here? And basically if I figure out what's said there, no matter what I actually figure out,

that's kind of the answer?

MR. SACKSTEDER: That's where Dr. Bederson's analysis of this issue is. And he didn't, as I said, have any opportunity to further explain it, because he didn't need to. It wasn't rebutted in the expert report.

THE COURT: Right, right. I get that argument. That certainly explains why he didn't talk about it any more, and it also perhaps may even explain why nobody asked him any questions about it at deposition.

MR. SACKSTEDER: And I'm not sure if Mr. Seal raised this or not, but the -- and there was some discussion of sort of how this happened with regard to claim construction. The becomes idle term was not a disputed term. It wasn't a disputed claim term. It was already there.

So there had been other litigation involving another claim construction process. Some of the constructions were imported from that. There was no dispute over becomes idle.

So I believe, Your Honor, when we -- we deposed Mr. Gaidemak a couple days after the Markman hearing last year, so I don't think Your Honor's Claim Construction Order had issued yet. But becomes idle wasn't in it. It wasn't a question. So if Plaintiff is saying that Mr. Gaidemak was somehow confused about, you know, what the claim

construction of becomes idle was when he said that UpNow practiced the claims, that isn't an issue because there wasn't any dispute over it.

THE COURT: Okay.

MR. SACKSTEDER: So I think I'm done on this topic.

THE COURT: All right. Well, why don't you go on to another one.

MR. SACKSTEDER: Okay. We'll go on to non-infringement. There are two different terms that are at issue here.

THE COURT: Give me one second before you do go on. Okay. Just checking to make sure all the questions I have here have been addressed, and they have.

So go on to the next one.

MR. SACKSTEDER: Okay. There are two different non-infringement arguments that are in our summary judgment motion. The first one relates to the term Internet browser where -- and I'll do a lot of fast forwarding through here.

So the construction, and I've never been able to memorize these four words in order, but it's a program that enables the user to find, locate, retrieve and navigate any web pages. Any web pages on the Internet.

THE COURT: Well, so I think it was the case that that construction, that was agreed upon; right?

MR. SACKSTEDER: It was agreed upon because it came from --

THE COURT: The Federal Circuit had --

MR. SACKSTEDER: -- the Federal Circuit and the Eastern District of Virginia.

THE COURT: -- said this is the construction.

MR. SACKSTEDER: Exactly. And in making that determination, the Federal Circuit said that it was supported by a whole bunch of dictionary definitions that talk about something allows you to surf the web --

THE COURT: Right.

MR. SACKSTEDER: -- things like that so --

THE COURT: So, right. I remember seeing Netscape Navigator and Microsoft Internet Explorer. And just going back to the definition --

MR. SACKSTEDER: Sure.

THE COURT: -- in the definition, there was some talk in the briefing about the user. And normally, I would think of the user as being you or me, some human being who's, you know, got a computer in front of them. But maybe that's not the right way to understand it.

Do you have any comment on that?

MR. SACKSTEDER: I don't think that that was the intention of the Eastern District of Virginia or the Federal Circuit in looking at the evidence that the Federal Circuit

relied on where it talks about software which allows a computer user. I mean, this isn't the construction. They were just determining whether the construction below was correct.

THE COURT: Right.

MR. SACKSTEDER: But it says -- and this, you know, said these support this construction. Software which allows a computer user to surf the worldwide web. And I think we can deduce from the way that the Federal Circuit relied on those, relied on references in the patent to then existing Internet browsers, you know, Internet Explorer and Netscape Navigator, that that's what they're talking about. What you were referring to initially, which is that it's a user of whatever system or program is being --

THE COURT: But that's a person.

MR. SACKSTEDER: Right.

THE COURT: Okay.

MR. SACKSTEDER: That's certainly, I think, how the Federal Circuit interpreted it. So if we could -- if Mr. Miller will hit play, this is what happens. Here we have -- that's a push notification that they say is the applet. And then you tap on it and you get a game. And nobody taps on a push notification and says, Boy, I really want to surf the web, and so I'll get this game and then it will allow me to find, locate, retrieve and navigate any web

11:34:11 page on the Internet.

11:34:13 It doesn't allow you to do that. It's just a 11:34:16 game. You play -- you know, you play this game where you 11:34:20 sort of make different candies. I'm trying to -- there we 11:34:24 go. You know, you sort of get three candies in a row, and 11:34:27 then they explode and things fall down and then you do some 11:34:30 more.

11:34:30 It's a puzzle game. And there is no dispute 11:34:33 that there's no ability in this puzzle game to -- I always 11:34:37 use CNN.com as an example because it has three letters. 11:34:41 That's how I tell if my browser works. I type in CNN.com.

11:34:45 You can't do that. You can't go to any web 11:34:48 page. In fact, you don't go to any web page, period, not 11:34:52 just the one that you select. But when you open the game, 11:34:56 when you tap on the push notification, what happens is the 11:35:00 game opens.

11:35:01 Now, the game is able to connect to King servers 11:35:04 over the Internet because sometimes they have to update the 11:35:08 game. Sometimes the game has to know what level you're on, 11:35:11 things like that. But it isn't going to a web page. It's 11:35:16 not even going to one web page. And it certainly does not 11:35:20 allow a user to find, locate, retrieve or navigate any web 11:35:24 page.

11:35:28 So there's also an argument based on a single 11:35:32 line of decompiled code that references UrlLauncher. And it

is not really relevant to this at all, and it certainly doesn't prove -- it doesn't do anything to prove infringement. UrlLauncher is -- it's highlighted there. And this is -- by the way, he only looked at the decompiled code for an Android device, so that's what this is. What that does is it actually uses, not a URL, but something called a uniform resource identifier, which is a super set which includes URLs.

But in this case, it does not include a URL. And all it does is go to the place on your phone that Candy Crush is stored and open it. So it goes to something on your phone. It doesn't go to the Internet at all.

THE COURT: Is this something that both experts have addressed?

MR. SACKSTEDER: Our expert certainly has. And their's, it's a little bit hard to tell what their expert says sometimes, frankly, but it's -- he has discussion in his report and relies on this.

THE COURT: And he says something different than your expert, presumably?

MR. SACKSTEDER: Kind of. At one point he said he -- it opens an HTTP connection, which HTTP is hypertext transfer protocol. That's how all kinds of networks communicate, including on the Internet.

But in this case, Dr. Bederson clearly says it

doesn't do that, and he doesn't effectively rebut that at all. What happens here is that you open the game. And I don't think there's any dispute about that. What happens here, what they're saying is you could go back into the code, and you can mess with it, and you could have it go to another web page.

So I don't think they will dispute the UrlLauncher's use. I don't know if Dr. D'Andrade, by the way, knows what it does exactly because he, one, only reviewed decompiled code for one implementation of one game.

Two, he has never even installed the game on a phone. He's never played the game. He's never used the game. He thinks maybe he's seen a push notification on his wife's phone, but he doesn't remember for sure. So he doesn't really have any ability to offer any meaningful evidence about what happens when you tap on the push notification.

THE COURT: But presumably, I haven't checked this out -- obviously, he's a code expert; right? I mean --

MR. SACKSTEDER: I would dispute that, but that's for another day maybe. He's --

THE COURT: And so he doesn't have to play the game, if he can understand what the code says.

MR. SACKSTEDER: And I don't think he would dispute that when that line of code is activated, what

happens in Candy Crush is the Candy Crush opens, and that's it.

THE COURT: In any event, what your expert said is somewhere in this -- actually, you probably don't have a pointer. I see it like near three-quarters of the way down something that appears to say log.e maybe UrlLauncher.tag. That's the line of decompiled code that we're talking about here?

MR. SACKSTEDER: Well, the one that I'm talking about is the one, the higher up that's highlighted in red.

THE COURT: Oh, okay.

MR. SACKSTEDER: Yeah. I think that's the one that they -- but when they provided their infringement contentions initially, they sent us that line and the couple of lines surrounding it. I don't think we had that whole amount until we got his expert report.

THE COURT: But the URL doesn't appear in the box you've highlighted in red, it's URI; right?

MR. SACKSTEDER: It -- yeah, exactly. That says URI. Down below, it says UrlLauncher.

THE COURT: Well, and so I'm going to give Mr. Seal a chance in a minute, but considering that the briefing was talking about UrlLauncher, or at least I thought it was, I'm not sure why -- so I see what you have says URI. And about URI, you say Dr. Bederson says that

refers to a place on the device, not some website somewhere.

MR. SACKSTEDER: Right. And that's what -- there's no dispute, I don't think, that this line is what activates the game. So you go out and you get the game.

Now, if the UrlLauncher, which says failed to start activity for intent, if that were ever used, which it is not, and certainly not when the push notification is tapped on, you have to have a URL to go to in this case. And I don't think there's any evidence from Dr. D'Andrade that it's ever used to go to a website. It's used to -- you know, the URI is used to launch the game, and that's what happens. And there's nothing besides that.

And we're talking about what happens when the --

THE COURT: Well, so --

MR. SACKSTEDER: -- applet is activated.

THE COURT: So, Mr. Sacksteder, at some earlier point, you said it may go to the King server to get a game update. Presumably, that's not the URI that does that; right?

MR. SACKSTEDER: Right. It's the game. The game can connect. Doesn't have to connect. You can play it without connecting to the Internet at all. But if the game can connect to a King server to, for instance, update the game.

THE COURT: And that does that by some other

code somewhere else?

MR. SACKSTEDER: Yes. Yeah, I mean, it's part of that. This is part of opening the game, but then the game can otherwise connect. And I don't think Dr. D'Andrade has identified the specific code that does that.

THE COURT: Okay. I take it -- you know, I've read the relevant briefing on this, but I don't necessarily study everything that's cited. I take it what you're telling me that in the briefing there's some paragraphs of Dr. Bederson's report that you have cited for what you say the URI does; right?

MR. SACKSTEDER: Yes.

THE COURT: Okay.

MR. SACKSTEDER: Yeah, definitely. He discusses that a great deal. And I may have misspoken. It may be that the lines that include UrlLauncher down below are the lines that they actually put in their infringement contentions initially. But, in any event, what actually -- and we're talking about when you activate the applet, basically, when you tap on the accused applet, which is the push notification, what happens is that an Internet browser deploys.

And the thing that happens there is that highlighted string. And when the applet or the push

11:43:20 notification is tapped on, that executes and you end up with
11:43:24 the game being opened.

11:43:27 Now, even if the UrlLauncher went somewhere,
11:43:32 which I don't think there's any evidence in the record that
11:43:34 it does, that it actually causes you to go out to a website.
11:43:37 In that case, it would be a website that was programmed in
11:43:41 by King. And so it isn't something that is an Internet
11:43:46 browser in that it lets you to find, locate, retrieve and
11:43:51 navigate any website on the Internet.

11:43:53 So, even if URLLauncher did something, it
11:43:57 doesn't do what an Internet browser has to do as construed
11:44:01 by the claims. And what I think the Plaintiff is now
11:44:08 talking about is something that the Federal Circuit has
11:44:11 specifically rejected previously, which is just connecting
11:44:14 to something over the Internet. That's not good enough,
11:44:18 according to the Federal Circuit.

11:44:20 THE COURT: Yeah. I think I -- so I wrote down
11:44:26 here that in the *United Bank*, what the Federal Circuit said
11:44:31 the proposed interpretation of Groove, which they rejected,
11:44:41 was "program capable of interacting with servers over the
11:44:46 Internet to send and receive information." And, clearly,
11:44:52 there's some daylight between that and the construction they
11:44:56 did adopt about, you know, finding and navigating web pages
11:45:04 on the Internet. Although I guess the Internet is in both
11:45:09 of them.

11:45:11 So, okay.

11:45:14 MR. SACKSTEDER: But even if -- you know, even if you could do this, and one of the arguments was that the -- citing I think the *Finjan* case, they say that, Oh, well, you could -- you know, even if that doesn't go anywhere, you could make it go somewhere.

11:45:31 But the user can't make it go somewhere. The only person who can do it is a programmer who goes in and changes the programming so that it goes to a specific Internet that the user has no choice about. A specific website that the user has no choice about.

11:45:47 So there is no capability to find, locate, navigate and retrieve any web page on the Internet.

11:45:56 THE COURT: Okay. There was some discussion in the briefing about a hypothetical that I think was if the employer blocked you from going to some websites, you were saying that's not an Internet browser?

11:46:21 MR. SACKSTEDER: I don't think we were really saying that. I think that was raised by Groove as saying, Well, some things that you look at and say, Oh, that's an Internet browser, maybe your employer modified it to say that you can't go to CNN.com. And in that case, there's at least one web page on the Internet you cannot go to.

11:46:43 In that case, to the extent that it is a technical restriction rather than just a rule at somebody's

workplace, maybe that's not an Internet browser. That falls under this definition perhaps. But, you know, I think that the way that that normally happens people say, You can't go to a specific website, and they don't really block them. But I think that's kind of a red herring.

I think the question is whether what is provided -- remember, we're not talking about somebody's workplace. We're talking about a video game --

THE COURT: Right.

MR. SACKSTEDER: -- whether that's an Internet browser.

THE COURT: And getting back to the construction that we're using about enabling the user -- a program that enables the user to blah, blah, blah and navigate any web pages on the Internet, essentially the any web pages, at least your understanding of that, is essentially all web pages.

MR. SACKSTEDER: The user has to be able to find, locate, navigate and retrieve them. And I think that that usage in the construction itself means that -- it means, you know, any web pages that you want to go to effectively. I know that's not part of the construction, but that's how you -- I would interpret it, especially in light of what the Federal Circuit said, which is all these dictionary definitions that talk about surfing the web and

so forth are supportive of this construction. So I think it's pretty clear that the Federal Circuit was talking about that.

THE COURT: You know, one thing that's probably beyond anything that I'm going to do, but I'm just curious about is in the context of the claim, you know, where it says, and I'm quoting here, "wherein an Internet browser is configured to deploy subsequent to deployment of the one or more applets then becomes idle upon deployment of the Internet browser."

Would this work with an Internet browser in the middle of all this that you could go to any web page?

MR. SACKSTEDER: Including a game?

THE COURT: Including a game.

MR. SACKSTEDER: I don't think there's any allegation of that in the record. But if an Internet browser deployed upon, you know, deployment of the applet where you tap on the thing that is accused to be the applet and an Internet browser opens, it's certainly closer than what we're talking about here where just a video game opens.

THE COURT: Okay. All right.

Do you have anything else on this?

MR. SACKSTEDER: A caveat. I haven't thought about that much, but I think that, you know, this is a different situation.

No, nothing further. Thank you.

THE COURT: All right. Thank you, Mr. Sacksteder.

Mr. Seal.

MR. SEAL: Thank you, Your Honor. I'll do my best to respond to all those points. Suffice to say, we disagree with all of them.

To start with, the idea that the Federal Circuit's claim construction of Internet browser requires what really is an address bar. So King would have you read this claim construction in such a way that a user could go to the top of a window and type in CNN.com or anything like that. That is not something that was briefed in the Eastern District of Virginia who issued in claim construction. It's not something that was briefed or considered by the Federal Circuit who affirmed this claim construction. That requirement has never been argued as part of any claim construction surrounding this.

THE COURT: But, you know, Mr. Sacksteder, he didn't say that. I mean, the construction is pretty wide ranging; right? A program that enables the user to find, locate, retrieve and navigate any web pages on the Internet. Maybe to find web pages on the Internet, you have to have address bars, but that's --

MR. SEAL: Dr. D'Andrade testified that a user

accomplishes each of those things, finding, locating, retrieving and navigating by clicking hyperlinks. It doesn't need to enter an address if there's a link. And that's exactly what we claim happens in the accused products, that there's --

THE COURT: So if you click on a link, how is that navigating web pages on the Internet?

MR. SEAL: Because you are using that link to get to that web page. And that's also how you find it. You click on that link, you find the web page. You --

THE COURT: And so how is that different than the construction that the Federal Circuit rejected, "program capable of interacting with servers over the Internet to send and receive information"?

MR. SEAL: Right. So the construction we argued in that case and the Federal Circuit didn't require any action on the part of the user. Simply, receiving information over an HTTP gateway, in our view, and that argument was sufficient to qualify something as a browser. And the Federal Circuit disagreed with that, and it went with the requirement that the user has to be able to do these things.

And so that's what we're arguing now. The user accomplishes this functionality of finding, locating, retrieving and searching by clicking on links.

THE COURT: So what you're saying is a link is an Internet browser?

MR. SEAL: A link opens up the Internet browser functionality, yes. A link is part of a browser. It's not -- the link itself is not the browser. It activates browser functionality. Yes.

THE COURT: Okay.

MR. SEAL: The HTTP protocol essentially is what takes that link and directs the user to the website. And Dr. D'Andrade testified about that extensively in his report. We cited, I think, three or four full pages of it in our brief as exhibits.

THE COURT: Okay.

MR. SEAL: The point is there's no intrinsic or extrinsic evidence that suggests that a user, for purposes of this claim construction, needs to able to type in CNN.com or any other website. That's simply King's interpretation of the construction. They're asking you to construe the construction, which I know happens.

THE COURT: Well, I mean, at this stage of the case, I'm the one who's interpreting the construction; right?

MR. SEAL: Right.

THE COURT: All right. And so what's the minimum -- so to you if there's a link -- if it appears on

the screen of the user that there's a link to someplace, that meets the Internet browser limitation?

MR. SEAL: If the link -- the user has to click on something that activates the link, then yes, then the browser functionality is deployed. Simply having the link by itself, if no action is taken, which is what our position was in the *United Bank* case, would not meet this claim construction. Correct. There has to be a user action that launches the browser from the link.

And I wanted to point out, also, that the example of a business that blocks certain websites is extremely relevant to King's understanding of this limitation because the inventors of the '762 patent didn't come up with a new type of browser. This is a conventional browser. And to say that a browser like Internet Explorer or Netscape Navigator would no longer be a browser under this construction because an employer has blocked a gambling website, or CNN.com or any website that they block because a user can't access that particular website, to say that that Internet Explorer is no longer a browser doesn't make sense. Clearly, it's still a browser, even if the user has some restricted access to certain websites. The functionality is there to enable the user to go to any website as long as the user is allowed to do that. Any link that the user is provided with, the user can click and find, locate, retrieve

11:55:50 and navigate to that web page. And that's what Dr. D'Andrade testified.

11:55:58 THE COURT: All right.

11:55:59 MR. SEAL: Also, on the infringement evidence -- if we're done talking about the construction, I'll move on to the infringement evidence.

11:56:04 THE COURT: Okay.

11:56:05 MR. SEAL: The infringement evidence here, Dr. D'Andrade looked at the code and he is unquestionably a code expert, right. I understand that Mr. Sacksteder may not want to agree with that, but --

11:56:12 THE COURT: Yeah. I thought, for present purposes, that was undisputed.

11:56:16 MR. SEAL: As far as we know, it is. Certainly, they never challenged his qualifications. But he looked at the code and saw that this UrlLauncher is activating HTTP protocol functionality. And that's also in the briefing. It's in, I think, Pages 16 through 19 of Exhibit 2.

11:56:33 THE COURT: So the thing that Mr. Sacksteder has drawn the red box around, is that the right line to have a red box around?

11:56:43 MR. SEAL: Dr. D'Andrade drew that red box. That is correct. He wanted to point specifically to that URI.parse(str) as part of his -- which he does discuss. But it's not solely that line. You can see up ahead in the --

one, two, three -- it's four lines down. There's a launch URL code section. There's also a UrlLauncher down below that, I think, that you discussed with Mr. Sacksteder.

So there are other places in this code section that talk about launching URL. It's not just the URI.

THE COURT: Well, so does Dr. D'Andrade agree with what Mr. Sacksteder said that URI is referring to something that's already on the device?

MR. SEAL: He disagrees, Your Honor. And he explained at his deposition extensively that a URI can include things other than HTTP, other than a URL. But here, based on the context of the code and the HTTP protocols that this code activates, the URI here is activating the browser functionality. And he specifically said it's not -- you know, it's not an FTP protocol transfer which is another thing that URI can do. That's a different protocol that uses a different standard than HTTP.

Here, because HTTP is implicated, the URI is expressly activating that browser technology, not something else. So that is a point of disagreement between the experts.

THE COURT: Okay.

MR. SEAL: And his basis for saying that was the code that he reviewed -- and, again, it's in the briefs. You can take a look at it, and his understanding of how push

notifications work, all of that. So he's not just relying on that one line. It's the entire code.

THE COURT: And so what's the relation in this particular code between the URI parse and the URLLauncher?

MR. SEAL: The URI parse -- so the URI includes the URL. It includes other things as well, but that is where the URL --

THE COURT: And when you say "includes," what do you mean?

MR. SEAL: A URI is not just one thing. It's a package of items. And one of those items, as testified by Dr. D'Andrade, is an URL, in this instance. And it has to be a URL because of the HTTP functionality.

But it also can include -- there's a file transfer protocol called FTP, which is not HTTP. It's a different protocol. That's not a browser. That's more of a direct tunnel from one server to a client. So that we're not arguing that that's a browser, but that is another thing that the URI can include. And Dr. D'Andrade said that's not what's happening here because it's HTTP, but that is something URI can have as well.

THE COURT: And all of this talk of code, does it have some independent significance other than the in relation to or in comparison with the argument that clicking on a link opens an Internet browser? In other words, is

12:00:02 this just like a backup for that argument?

12:00:04 MR. SEAL: No. Oh, no. This is the basis for the argument. This is the argument that there is necessarily a URL contained within that URI.parse string. And the reason we know that is because the other evidence Dr. D'Andrade points to is that this code activates the HTTP protocol, which is a browser protocol. So in order for it to activate that protocol, there has to be browser functionality. It wouldn't do it otherwise.

12:00:29 THE COURT: And you said in your brief, cites Dr. D'Andrade's opinions relating to this. The opinions you're citing, they're in his expert report. They're not things that he said at deposition; right?

12:00:48 MR. SEAL: Both, Your Honor. So Exhibit 1 to our opposition brief to King's summary judgment motion is a selection of excerpts from his expert report.

12:00:56 Exhibit 2 is excerpts from his deposition. And he goes through this discussion at great length in the deposition as well as to why this particular code section implicates a browser.

12:01:09 THE COURT: Well, I guess I'm more interested in his report because at least the portions, I think it was of him, that were quoted in the briefs, I wouldn't say -- there weren't a whole lot of sentences in it. There were fragments of phrases followed by more fragments of phrases.

12:01:33 It didn't seem very persuasive to me that he was -- I
12:01:37 couldn't understand at all what he was saying, and I figured
12:01:40 his expert report would probably be a lot easier to
12:01:44 understand in terms of what his opinions actually are.

12:01:48 MR. SEAL: So I say we attached his report.
12:01:50 What we attached as Exhibit 1 to our opposition brief really
12:01:53 is the exhibit to his report which is the claim chart he put
12:01:57 together. It has all of the evidence in which he relies.

12:02:00 So this particular code section I believe starts
12:02:03 on Page 16 of that claim chart. The discussion goes through
12:02:06 Page 19 where he explains why this particular code section
12:02:10 activates a browser. He goes into a discussion of why he
12:02:13 knows it's a browser because of the HTTP protocol that's
12:02:16 present here and so on. So it certainly may not have a
12:02:23 narrative flow to it, but all the evidence is there.

12:02:27 THE COURT: Okay. And so, just to get back to
12:02:41 the claim construction or to tie this into claim
12:02:44 construction, the argument, your argument, your expert's
12:02:53 argument is that the user clicking on the link is the user
12:03:02 finding, locating, retrieving and navigating at least one
12:03:12 web page on the Internet; is that right?

12:03:14 MR. SEAL: That's correct. And our position is
12:03:16 that it works with any web page on the Internet which is why
12:03:19 it meets the limitation.

12:03:22 THE COURT: And how does the one link get you to

anything other than the web page that you get to from the link?

MR. SEAL: It doesn't. So to get to another web page, you have to click on another link. One link gets you to one web page. But for purposes of this claim construction, that's sufficient because any link that's provided to the user, whatever it is, the user can click that link to get to that web page using the technology in this code.

THE COURT: And the construction that you proposed in the *United Bank* case -- so your theory is that this code or the actual code enables a user who's presented with a link to find, locate and retrieve the web page that the link leads to?

MR. SEAL: Correct. And that link could be for any page on the Internet.

THE COURT: And so the fact that the way -- I take it as a fact that the way this game, Candy Crush, is set up is there's only -- the link that appears could be a link to anything.

MR. SEAL: Could be.

THE COURT: I mean, anybody that wants to advertise essentially.

MR. SEAL: Correct, Your Honor.

THE COURT: So what the game allows the user to

do is to find the web pages that the link presents, but not the web pages for which there is no link presented?

MR. SEAL: Correct. And, again, we analogize that to the situation which the player blocks certain websites. The King game will allow the user to follow links to any website that Kings puts into the game. King may not put in all websites. King does not put in all websites. That doesn't mean that it's not a browser. Just like the fact that Internet Explorer is blocked from retrieving certain websites is not a browser -- that's still a browser just like the King product is still a browser.

THE COURT: There seems to me to be some difference, having worked for various employers over the years that wanted to block me from finding any social media sites on the web, that there seems to be -- I don't know. It seems to be a difference of scale, if nothing else, between blocking me from going to certain places as opposed to giving me the option to go to one particular place. Right?

MR. SEAL: This is not a scale issue. This is a matter of what the claim construction allows the user to do. And our position is that by allowing the user to follow links, whatever links are available, that's sufficient. King's position is that it's not sufficient unless the user has the ability to type in certain web addresses.

12:07:37 THE COURT: Right.

12:07:37 MR. SEAL: So we disagree. That's where the lines are here.

12:07:39 THE COURT: It's kind of -- there's something out there. King, the code, there's something out there giving the user the ability to navigate a web page on the Internet, or is it sort of directed by the user as to where they go?

12:08:02 MR. SEAL: And there was also a question as to what constitutes a user, and that's not clear from the Federal Circuit's construction, either.

12:08:07 THE COURT: Well, so I've proposed a user is a human being. Do you disagree with that?

12:08:21 MR. SEAL: We would agree that a user is a human being. I don't necessarily know that I would agree that it's limited to a human being. We gave the example of King being a user of its own products, so it could be a corporate entity using -- which would ultimately still be a user at some level, an individual at some level.

12:08:37 THE COURT: Okay. Right. So maybe an individual wears a corporate hat, but a human agency is the one who is the user.

12:08:47 MR. SEAL: I think we would agree with that.

12:08:48 THE COURT: Okay. I'm not sure then that there's really any -- okay.

All right. Anything else?

MR. SEAL: Just the last point I wanted to make is that we're using terms like find, locate, retrieve and navigate. Surf, which came up in the Federal Circuit's construction. And Mr. Sacksteder is using those terms as if they inherently must enable a user to do a particular thing which is type in a URL or type in an IP address. And there's no evidence for that. So I think it would be improper to import that limitation into this claim construction.

That's all I have.

THE COURT: Okay. Thank you, Mr. Seal.

Mr. Sacksteder.

MR. SACKSTEDER: Thank you, Your Honor. I have a thing or two to say.

First of all, there is no evidence of any link in the code in the operation of the game, so we aren't even sure what link they are referring to to take you to anywhere. And certainly what we're talking about is actually activating the push notification. And Dr. D'Andrade identified -- he did -- he put that rectangle, that red rectangle around that line of code and said, "Here's where it happens." And all that does is go and get the game. And I don't think there is a dispute about that.

It is possible for an HTTP connection to be open

12:10:13 to the game at some point, but they don't identify specifically how that happens. The log.UrlLauncher down at the bottom is not something that Dr. D'Andrade has relied on at any point. And all that does is log the activity.

12:10:30 So if you have tapped on a push notification, it gets logged somewhere, so the program knows it has happened. So, again, nothing to do with anything being an Internet browser.

12:10:45 A couple of things that I want to do to provide the Court with sort of the places to look. Mr. Seal identified Pages 16 and 17. I think there's also 18 and maybe a little bit on 19 of Dr. D'Andrade's claim chart, which is really in his expert report the only place that he provides any substantive discussion at all of this topic. And he provides very little at that point. He provides this screenshot and then he says URI is a uniform resource identifier that includes a URL, but he doesn't explain how or whether it actually happens in the King game.

12:11:29 Then he says the URI can include a URL for any web pages on the Internet allowing a user to find, locate, retrieve and navigate any web pages on the Internet. Pretty conclusory. Again, there's no substantive discussion about how that actually happens. There's no identification of any link.

12:11:47 On the next page on Page 18, he says that in

response to a user actively clicking on or touching the notification, the application retrieves content over an HTTP connection. Then he says, i.e., deploying a browser.

He says the HTTP/2 protocol is "a program that enables a user to find, locate, retrieve and navigate any web pages on the Internet."

HTTP is not even a program. It's a protocol over which things communicate over the Internet, but they certainly don't create necessarily a connection to a web browser or to a website.

And so I don't -- and that's pretty much it. I mean, that's his evidence in his report. So if you look from Pages 16 to 19, I think you'll see that's what he has.

Now, in contrast to that, if you look at Dr. Bederson's report, I think you'll find a much more clear explanation of what really happens. That's in Paragraphs 356 and 357 and Paragraphs 445 through 448. And I think that there's nothing in Dr. D'Andrade's report that rebuts anything that Dr. Bederson brings up.

Talking about the user and sort of its use in the claim construction, my belief is this is actually talking about the next limitation we're going to talk about. But this is a claim -- if you look at the preamble, it says a system for delivering information to a networked device of a user. So I think that's what they're talking about is the

user. That is what the claim is all about. And I think it's somebody who is not the person who is in there coding and typing in -- you know, typing in an infinite number of URLs in the code so that you can go to any website. I think it's a person who's actually using the application which does not include Dr. D'Andrade because he's never done that.

All right. So a couple of other points that Mr. Seal mentioned earlier. He said when he was trying to provide context, I guess, for the Federal Circuit's decision and the Eastern District of Virginia, he said it was never briefed, and this theory was never briefed. Well, that's because there was a stipulation of non-infringement in the Eastern District of Virginia so the claim construction issue could go up to the Federal Circuit.

THE COURT: Still doesn't detract from the fact that it was never briefed; right?

MR. SACKSTEDER: Sure. I mean, they didn't -- you know, this particular issue was not briefed, but the Federal Circuit had the evidence for claim construction, and that's kind of how the Federal Circuit was supposed to behave when it did that.

THE COURT: Well, no. I mean, not my place to say whether what the federal -- to comment on what the Federal Circuit does, but yeah, they issued an opinion. It's got some rulings in it, and I take it at face value.

MR. SACKSTEDER: Okay.

THE COURT: All right?

MR. SACKSTEDER: Okay. I do have one or two more points, not very long.

THE COURT: Okay.

MR. SACKSTEDER: Let me see. Okay. Just one more point.

You know, there is no URL in the code that was examined. And remember he -- you know, I'm not crazy about the use of decompiled code. If we get to it, Mr. Miller will talk about why it's unreliable. But that's -- you know, that purports to be the code for the game as it is provided. And there is no place in that code that Dr. D'Andrade actually points to that actually has any URL. So that, according to him, is the game as it's distributed to people, in this case, on the Google Play Store.

He doesn't go through that decompiled code and say, ah-hah, there's that link. There's that URL. That's that one place where it takes you to one website. We don't think that's enough, but he doesn't even provide evidence of that.

So, I think that's my final point.

THE COURT: So having a UrlLauncher in the code, whatever that might actually be, it doesn't work unless it also has URLs in the code?

MR. SACKSTEDER: Yeah. There's no URL to launch. You have -- as the game comes to the user, you're not going to launch a URL. There's no place -- I don't think there's any contention that there's a place where the user can put in a URL and say, I want to go to this site.

And so it has to be something -- and I think that's how I understood Mr. Seal as explaining it -- it has to be something that King put in. And here's a link that allows you to go some places, a URL that takes you to a website.

Dr. D'Andrade didn't point to a URL that takes you to a website. So just the fact that they're --

THE COURT: Is that the argument you were making in the briefing?

MR. SACKSTEDER: Well, I think I was responding to something that Mr. Seal said today.

THE COURT: Okay.

MR. SACKSTEDER: But, I mean, I don't think there's any evidence. There's certainly nothing in Dr. D'Andrade's report that says, Here is a URL. Here is a link that the game takes you to a website. And I --

THE COURT: And I guess the point or my point is that I have the impression that you've gone -- and by "you," I mean both of you -- you've gone to a place where you're talking about things that weren't said in the brief. And I

have enough trouble understanding things that are said in the brief without trying to also understand things that aren't said in the brief.

MR. SACKSTEDER: I believe I was trying to address, and it may be in our briefing, just that there's no actual URL. But Mr. Seal was saying, Well, you open the game and then it goes to a link. And there's no link, there's no URL for a link. And that's what I'm saying.

THE COURT: Okay.

MR. SACKSTEDER: I think I'm primarily addressing what I heard this morning --

THE COURT: All right.

MR. SACKSTEDER: -- or this afternoon.

THE COURT: So you said that was your last point on this. So why don't we go on to microprocessor.

MR. SACKSTEDER: Okay. Sure.

THE COURT: So, first off, you know, I've had cases before with microprocessor, and I've had cases with processor. What's the difference?

MR. SACKSTEDER: A microprocessor is smaller, maybe.

THE COURT: Oh, so --

MR. SACKSTEDER: I mean there's --

THE COURT: So, you know, this non-infringement argument involves a microprocessor which has not been

construed. Saying it's smaller than a processor, that's not very helpful.

MR. SACKSTEDER: I know.

THE COURT: You were --

MR. SACKSTEDER: I don't think I was serious.

THE COURT: You were being humorous, which I often appreciate, but okay. So you came prepared.

MR. SACKSTEDER: I happen to have a dictionary definition which we showed to Dr. D'Andrade in his deposition. As he brought out -- as we will discuss, he brought out a new theory in his deposition that was not in his reports, and it was maybe foreshadowed in his reply report. Certainly was not at all in his opening report, and we'll kind of get to that.

But to answer the question of what a microprocessor is, this is from the *Microsoft Computer Dictionary* from 2002, which is the most current version of that document, that source at the time the patent was filed. It says it's a central processing unit on a single chip that can easily fit in the palm of one's hand.

And they intentionally used the term microprocessor in their claims. They could have said lots of other things. And their theories now are a lot of other things that are not microprocessors. And --

THE COURT: And I guess one of the points is a

microprocessor is what runs your phone; right?

MR. SACKSTEDER: Yeah.

THE COURT: That's a small thing that fits into the palm of your hand, so you have to have a small processor in it.

MR. SACKSTEDER: It runs lots of things. It runs servers. It runs, you know, your desktop computer. There may be more than one in your -- in various devices. You know, it could be lots, or one or whatever, but it's a central processing unit for a device basically. And the definition is that it's on a single chip and it fits in the palm of your hand.

THE COURT: And I thought I saw in the briefing somewhere different or a different dictionary encyclopedia where it says it's usually on a single chip; right?

MR. SACKSTEDER: Okay.

THE COURT: So, I guess, does it matter whether it's on a single chip or it's like on, I don't know, two chips?

MR. SACKSTEDER: You can have multiple chips that are collectively the central processing unit of a device that are --

THE COURT: Well, that are --

MR. SACKSTEDER: -- together.

THE COURT: -- typically a microprocessor.

MR. SACKSTEDER: I don't know if that meets the definition of microprocessor or not. But microprocessor means something and it means chips. You know, and I don't think there's any dispute about that. Maybe -- you know, I think that the difference here is that Groove says it means every chip in the Apple and Google universe in one of their theories, and we don't think that's right. That it is a specific physical device, and it can be -- okay.

So the uses of it in the claim are a microprocessor at the beginning. I don't think there's any dispute a means one or more. And I don't think there's any dispute that the, as it refers back to the antecedent, a microprocessor, means the same one or more.

THE COURT: You know, you say that, but one of the things that I was curious about when I was reading the briefing here, because I just wrote a opinion on it in a different case, was there are some Federal Circuit cases in the very recent past that sort of go from a microprocessor. And then when they're talking about the said microprocessor, which I think is the same thing as the microprocessor, they say, No, it doesn't -- the one or more doesn't carry over.

And I will cite you to *Salazar vs. AT&T Mobility*, which is 64 F.4th 1311 from earlier this year. And *Finjan vs. Sonic Wall*, 84 F.4th 973. That may or may not be the right cite. That's from a month ago.

So I was wondering, to the extent that the argument is the processes are in the Google cloud somewhere or somebody's cloud, I was not entirely sure that, even if that's true, that that meets the claim limitation.

MR. SACKSTEDER: I think it doesn't meet the claim limitation. I think my understanding of the law is that when you have the, and it refers back to an antecedent, that you're referring to the same antecedent.

It's the same with said. They're basically synonymous. And I don't think there's any dispute about that.

I think the only sort of point on what these articles mean is that the one or more -- you know, a can be one or more -- can't be a completely different one or more when you're using the to refer back.

THE COURT: Well, that's what the cases said is because, in at least one of these cases and in the case that I decided a week ago or whenever it was, there was one microprocessor that did one thing and a different microprocessor that did a different thing. And what the Federal Circuit said is that the microprocessor in all these places has to be the same microprocessor.

MR. SACKSTEDER: That's what we're saying.

THE COURT: Okay. All right.

MR. SACKSTEDER: That is exactly our argument is

12:25:26 that the same microprocessor has to perform the functions of --

12:25:30 THE COURT: Well, and, therefore, to the extent you say it's off in the clouds, you have no idea whether it's the same microprocessor or not.

12:25:36 MR. SACKSTEDER: Right. That's my argument.

12:25:38 THE COURT: That's your point. Okay.

12:25:41 MR. SACKSTEDER: Yeah, is that it has to be the same. Or -- and, you know, let me take it in order.

12:25:47 THE COURT: All right. Sorry to --

12:25:48 MR. SACKSTEDER: Getting myself out of order. No, it's my fault.

12:25:51 THE COURT: No, probably my fault.

12:25:52 MR. SACKSTEDER: So if you look at what these microprocessors are supposed to be doing in a.1, "a microprocessor running a software application for delivering an applet application to the networked device."

12:26:09 And in the accusations of this case what they're saying is that there is a microprocessor that runs a software application that is at Apple or Google, their App Store or Play Store there. Part of this is a diagram from a King document. We added on the App Store and Google Play because this is just for the delivery of push notifications.

12:26:37 Okay. So there is a microprocessor on a server somewhere. When I go to the App Store, and I say I want to

download Candy Crush Soda Saga, and that microprocessor talks to my phone and sends the code that is going to run that game on my phone.

Okay. So that's the first claim limitation that we are delivering the -- they say the game, by the way, is both the applet application and the Internet browser, which, you know, different things in the claim can sometimes be satisfied by one thing, but that's what we're talking about here.

So the other thing is that there are a couple of databases that are coupled to the microprocessor. You might remember a discussion of the term coupled in the claim construction, but probably not. I wouldn't blame you if you didn't.

THE COURT: No.

MR. SACKSTEDER: And then the key is in E where the microprocessor, meaning the same one, compares the first set of information to the second set of information. And in the allegations here what they're talking about is you have two databases that have different sets of information for deciding whether you're going to send a push notification to somebody. Okay. And so those two databases are compared and the people who sort of meet both of them. Then the system says, Okay, send them a push notification.

Okay. So our view of this claim, and I think

under the cases that you just referenced and the *Warner-Lambert* case that we referenced is it's got to be the same microprocessor. Okay. It isn't.

Now, they have had two different theories. Their first theory was this one was that the game app is downloaded. And there's no question that the game app is downloaded by a server that runs in conjunction with the App Store or Google Play.

And then the second one is somewhere at King, and they've never been specific about that because they never, you know, reviewed the code to look for where that is. And this was actually, I think -- yeah, okay.

So here's where Dr. D'Andrade talks about sort of how that comparison step happens and where it happens. And he talks about there are device tokens that are taken from a database that are maintained by Apple or Google and then sends this information to the King servers for comparison.

Now, if that is their theory, then, you know, they're saying that the two -- the microprocessor at King is the same microprocessor as the one at the Apple App Store or Google Play.

So then we had a different theory that came up in Dr. D'Andrade's deposition. And by the way, he hadn't even discussed this at all in his opening report. He hadn't

used that diagram I just used until his reply report, after it was used in Dr. Bederson's rebuttal report.

So then he said, No, what really happens is the tokens get compared at Apple or Google. They don't get sent to King for comparison. I don't think we got a very meaningful response about, Well, why did you say they were sent to King for comparison before?

But his point is that, Okay, they get done at Apple or Google. He has no evidence where they get done. He doesn't know, you know, whether they're performed at King, or at Apple or Google. And he certainly has no evidence that they're performed at Apple or Google. But he also doesn't have any evidence that they're performed by the same microprocessor at Apple or Google.

And so what he says was it's all one big microprocessor. Anything that's sort of in the Google or Apple universe, it's all one big part of the cloud. And then we came up with this dictionary definition, and he criticized it because Microsoft doesn't know anything about hardware. It's just software. But I don't think he had a substantive response to it.

And so, you know, the thing is that his second theory then comes to maybe -- maybe we don't have that part, but -- oh, okay. Here we go. That it all happens in that red dotted line. That's Apple or Google.

12:31:04 You know, and so this wasn't really stated until his deposition. And it doesn't matter any way, because he says everything at Apple or Google is one big microprocessor. It's in the cloud.

At one point I said, "How do we know what microprocessor it is?" And he said, "Well, that's kind of the point of the cloud. You don't need to know."

But that's not what the claims say. The claims say a microprocessor and the microprocessor. And they could have used different language in their claims and they did not.

So their argument, their only other argument here is that, Well, the a means one or more. And so you can have multiple microprocessors at Apple or Google, but there are sort of -- you know, the top part is maybe the one or more microprocessors that are downloading the app onto a user's phone. And then the ones at the bottom are the ones that, you know, compare the tokens. Still there is no evidence that they are the same one or more.

So the same group of one or more microprocessors does the step at the beginning of the claim and the steps at the end of the claim. And it's their burden to prove infringement, and they have provided no evidence whatsoever even to prove this far in the theory. And that doesn't get them there any way because it's two different groups of one

12:32:29 or more microprocessors.

12:32:32 THE COURT: I think your position, but tell me if I'm misunderstanding it, is they haven't shown it isn't two different groups of microprocessors.

12:32:48 MR. SACKSTEDER: Not quite.

12:32:49 THE COURT: Okay.

12:32:50 MR. SACKSTEDER: They're saying it's all one big mess.

12:32:52 THE COURT: Right.

12:32:52 MR. SACKSTEDER: Right. So they're saying they wouldn't draw those dotted lines. They'd say they're -- you know, Apple or Google certainly has many more than one or more microprocessors. And what we do is draw the dotted line and say, You're referring back to one or more microprocessors. And it has to be the same -- at least, you know, if it's multiple microprocessors --

12:33:14 THE COURT: Right.

12:33:14 MR. SACKSTEDER: -- it has to be the same one.

12:33:16 THE COURT: I don't know. It doesn't sound like we're saying anything different.

12:33:18 MR. SACKSTEDER: No.

12:33:19 THE COURT: Your view is the Plaintiff is saying it could be any Google microprocessor, not saying it's the exact same one, not saying it's different because it's all one large microprocessor.

12:33:34 MR. SACKSTEDER: Mm-hmm.

12:33:35 THE COURT: You're saying, Well, we're not saying they're two sets of microprocessors or two different microprocessors. We're just saying you've got the burden of proof and you have to show that it's the same one, and you haven't.

12:33:46 MR. SACKSTEDER: Yeah, this is -- you know, this is what it's likely to be. I think it's highly unlikely that saying microprocessors are downloading apps and comparing information, but we don't know, one way or another, and neither do they. And they have to prove it.

12:33:58 THE COURT: Right. Okay. I think we understand each other.

12:34:01 MR. SACKSTEDER: So that's our point.

12:34:03 THE COURT: All right. So that's it for this one; right?

12:34:05 MR. SACKSTEDER: That's it.

12:34:06 THE COURT: Okay. Mr. Seal.

12:34:07 MR. SEAL: Thank you, Your Honor. To be clear, Dr. D'Andrade's infringement theory with regard to the microprocessor has been consistent throughout. He puts sections in the brief which identifies the processor as the microprocessor as the one that downloads and runs the application. He refers back to that processor for being coupled to the first database. He, again, refers back to

that processor --

THE COURT: Well, so that's a processor, a microprocessor that's in the Google Play Store?

MR. SEAL: Yeah. So, yes, is the answer. Dr. D'Andrade refers to it as distributed processing. So the Google Cloud or the Apple Cloud effectively runs as a giant, what he calls, a big microprocessor. And that's okay under Federal Circuit precedent for claim construction. A microprocessor in the claim could mean multiple individual microprocessors working in concert.

THE COURT: But the one thing -- does he say the same microprocessor that sends the game is also the one that does the comparison?

MR. SEAL: Yes, he does.

THE COURT: And what is his basis for saying that?

MR. SEAL: That is on Page 36 of Exhibit 1 to our opposition brief where he talks about -- there's some evidence he provides for it, but then he indicates that that comparison that's being done is done by the same processor that downloaded and ran the application. And the evidence he cites to is there's a thing called a token. So Google and Apple generate a token that contains information about the device, the user, the game. They do send that token to the King servers, not so that the King servers can perform

the comparison, because later, when King wants to send information to that user, they send that token to Apple and Google who then compare their token with the token that King sends them and determine whether or not to send that information.

So that's the evidence that he pointed to and it's in his opening report. There should be no dispute about that.

THE COURT: So a lot of the language you're using, you know, I probably don't understand at all. But this use of the token, you say your expert says that I guess the token is generated for the first time when the microprocessor sends the game to the user or is downloaded to the user. And that at some later point, some token that's the exact same token or, I don't know, identifies the exact same microprocessor is sent to King in connection with the comparison and that -- can you run through it again?

MR. SEAL: Yes. So you're correct. There is a token that is generated when the game is downloaded that identifies the user or the device. It has information that's specific to that device at least. And that token is mirrored at King. So it's kept at Apple or Google, wherever the game was downloaded. It's mirrored at King or it's sent to King.

THE COURT: So, and I'm sorry, when you say it

has a device, blah, blah, blah, does it say what microprocessor of Google's it comes from?

MR. SEAL: It comes from the cloud server which is, in our view, a distributed big processor. It doesn't -- we don't say which specific component within the big processor it comes from, but it comes from the cloud service.

THE COURT: So all this talk about tokens back and forth, is this all to just say that we know from this that Google's the one who's doing the comparison?

MR. SEAL: Correct.

THE COURT: But in terms of whether Google, which must have a zillion processors and microprocessors, whether it's the same microprocessor, that's not in the right analysis, in your point of view. The right analysis is: Does it come from Google?

MR. SEAL: Correct. So Google undoubtedly has many millions of individual chips that constitute processors. What Dr. D'Andrade said was that they work in concert under a theory called distributed processing. I say a theory. It's an accepted principle of processing. So that the load can shift from chip to chip and spread the balance out across the system.

But the point is the individual chips, the individual physical processors work as a large processor.

And that's an acceptable position to take for claim construction because --

THE COURT: But a large processor seems to be not a microprocessor.

MR. SEAL: It's all microprocessors these days because of how -- as to how the information is captured on the chip. The chips are so small. There's no such thing these days as a processor that's not a microprocessor. I don't think that's a disputed position.

Our contention is that there are many individual physical microprocessors that are linked together to operate as a single microprocessor. And it's still a microprocessor because of how it works, how the information is put into the silicon. But it is still a microprocessor. The fact that it's a -- I think King used the term oxymoronic in their briefing. And to some extent I would agree that it is, but it's still a microprocessor. It's a cloud service distributed microprocessor.

THE COURT: So that the picture that Mr. Sacksteder showed of something you could hold in your palm, that's not the kind of microprocessor you're talking about?

MR. SEAL: Correct.

THE COURT: You're talking about something that we probably couldn't fit into this courtroom.

MR. SEAL: That's probably accurate, that it would not fit in this courtroom, but it is still a microprocessor. I don't want to be confused by the fact that micro means small. Microprocessors now, certainly a distributed microprocessor setting can be extensive and still be microprocessors.

THE COURT: Okay. All right. But, in any event, that's the point of dispute between you here. In your view is distributed microprocessors meet the definition of microprocessor. And the Defendants' point of view is you have to identify a particular microprocessor --

MR. SEAL: Correct.

THE COURT: -- a single unit.

MR. SEAL: And our position is that, according to Black Letter claim construction law, a microprocessor can be a group of microprocessors reporting to the group. The individual components within that group do not matter as long as the group of microprocessors is the same. The group of microprocessors -- and Dr. D'Andrade walks through in his report why that is the case -- then that meets the claim.

THE COURT: Okay. Anything else?

MR. SEAL: That's all.

THE COURT: All right. Mr. Sacksteder.

MR. SACKSTEDER: Dr. D'Andrade doesn't discuss any of this in his report. You can look all day, and you

won't find anything about distributed processing or big microprocessors, or cloud processing, or anything like that.

THE COURT: What about in his deposition?

MR. SACKSTEDER: In his deposition is the first place he raised this. And, I mean, I'm just saying it's not -- you know, Mr. Seal was saying it's clearly described in his report. It is not.

THE COURT: All right. Well, hold on a second.

So, Mr. Seal, is the distributed microprocessor that you've just been talking about, is that in his report or is it just in his deposition?

MR. SEAL: The term distributed processing came up for the first time in his deposition, but the theory of the Google cloud servers being the microprocessor was in his opening report as well.

THE COURT: Okay.

MR. SACKSTEDER: On Page 32 of Dr. D'Andrade's claim chart to his opening report, he -- yeah. He -- that's where he talks about these tokens that are generated at Apple or Google and that they are sent to King for processing. There's no discussion, Oh, that's a duplicate set or anything like that, and they're compared at Apple or Google. He says they are sent to King for processing.

He did not -- the diagram that I showed earlier, the ones with the green boxes, that's from a King document

that actually explains how the push notification system works in the King system. He didn't rely on that document. He didn't discuss that document. He did not, in his opening, report, even list it as a document that he considered.

He gave it a little bit more color in his reply report, but he still did not raise this big microprocessor theory at all. And I think that even what Mr. Seal just said, which is it has to be -- at least has to be the same group of microprocessors --

THE COURT: Right. He defined the same group as every microprocessor Google owns.

MR. SACKSTEDER: And then that means that the claim term, the microprocessor, means nothing if you read it that way.

THE COURT: Well --

MR. SACKSTEDER: They elected in prosecution of this -- they prosecuted this patent for 11 years, 10 years, and they elected to use the term microprocessor, a microprocessor, and the microprocessor performing this. There's no indication in the specification that, Oh, that should be a bunch of different microprocessors located all over the place. There's nothing in the report talking about cloud microprocessing.

And to the extent that he is discussing in his

12:44:41 report any purported evidence of these tokens, if you look he has some -- a screenshot of some code on Page 35 of his claim chart. And if you look at the source of the claim chart, it's access tokens from Facebook. And it isn't even clear how that connects to the King Google Apple system at all.

12:45:03 So it's their burden to prove that the same microprocessor or group of microprocessors performs all these functions. They have not come close to satisfying that burden.

12:45:15 THE COURT: All right.

12:45:17 MR. SEAL: Your Honor, if I could respond to one point?

12:45:20 THE COURT: Sure. Yes.

12:45:21 MR. SEAL: I just want to note that the statement in his report about sending the tokens to the King servers for comparison, that was discussed at length at his deposition and what he meant by that. And we can walk you through the initial claim chart he put, which makes clear that the comparison happens, or is done or performed by the same microprocessor that controls or manages the delivery of the application. That's never been in doubt.

12:45:50 And the statement that they're picking up on, which is subject to separate briefing entirely on its own, does not mean what they think it means. It doesn't mean

that King performs the comparison. It means that the token is sent to King for use in the comparing process. And he explains very thoroughly -- that's all in the briefing as well -- what he means by that.

So I just want to clarify that they are harping on that particular language. And he explained extensively, I mean, pages and pages of deposition transcript why their understanding of that sentence is incorrect. So we just wanted to get that on the record.

THE COURT: All right. So why don't we take --

MR. SACKSTEDER: Can I just correct one thing? I referred to Page 32 of his claim chart. It's actually on Page 34.

THE COURT: Okay.

MR. SACKSTEDER: Yeah. And, again, I don't think that there is any indication of this token comparison at Apple or Google being performed.

THE COURT: Okay. So let's do this: Let's take a ten-minute break. And what we're going to do after the ten minutes, I'm not entirely sure right now, but I'll tell you when I get back.

Okay? We'll be in recess for ten minutes.

DEPUTY CLERK: All rise.

(Recess was taken.)

DEPUTY CLERK: All rise.

THE COURT: All right. So why don't you all have a seat.

I don't think I'm going to hear anymore argument today. What I wanted to do was ask you all for two different things.

One of which is on this non-infringement argument we've just been hearing about, we've got this word microprocessor. I think I ought to have some Markman briefing about what a microprocessor means, how I should construe it, because it seems like a significant part of this non-infringement argument is about what's a microprocessor. You know, the Defendant's showing me something you can hold in your hand. The Plaintiff is saying Google. So that's one thing.

The second thing is on the Section 101 motion, I've got a couple of cases that were not cited in the briefs which I would like to get some briefing as to what you all think about them.

The first one is *Sanderling Management vs. Snap*, S-N-A-P, which is at 65 F.4th 698. It's a Federal Circuit case from 2023.

And then the other one is *Intellectual Ventures vs. Capital One Bank* which is a Federal Circuit case from 2015 that's at 792 F.3d, 1363.

I thought the *Sanderling* case seemed a lot like

01:10:09 what we have in this case. But, in any event, I would like to have you all submit some kind of briefing as to what you think about those two cases and the 101 issues in this case.

01:10:34 I haven't told you what the time frame is that I would like this briefing on. And before we decide that, I'd like to talk to Mr. Sacksteder, and Mr. Seal, and Mr. Blumenfeld and Ms. Pascale off the record for a minute or two.

01:10:55 All right? If you could come back to my conference room. I don't need my court reporter.

01:11:04 (Recess was taken.)

01:17:00 DEPUTY CLERK: All rise.

01:17:05 THE COURT: All right. Thank you.

01:17:07 So in terms of the two issues that I wanted briefed, I'll let the parties confer on a schedule, taking into account holidays near that are -- you know, don't kill yourselves over this. But when you agree on a schedule, submit a piece of paper telling me what it is and I will approve it. And I think that's it.

01:17:40 I do thank you, both sides, for their arguments this morning and afternoon. And unless there's anything else.

01:17:51 Is there anything else, Mr. Seal?

01:17:53 MR. SEAL: No, Your Honor. Thank you.

01:17:54 THE COURT: Mr. Sacksteder?

MR. SACKSTEDER: No, Your Honor.

THE COURT: All right. We'll be in recess.

DEPUTY CLERK: All rise.

THE COURT: Thank you.

DEPUTY CLERK: All rise.

(Court was recessed at 1:18 p.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Heather M. Triozzi
Certified Merit and Real-Time Reporter
U.S. District Court